[No. A088201. First Dist., Div. Five. Aug. 3, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK CHUNGLIANG HSU, Defendant and Appellant.

## COUNSEL

Swanson & McNamara, Edward W. Swanson and Alexis Haller for Plaintiff and Respondent.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Gerald A. Engler, Deputy Attorneys General, for Defendant and Appellant.

## OPINION

JONES, P. J.—Patrick Chungliang Hsu appeals his conviction by plea of nolo contendere of two counts of attempting to distribute or exhibit lewd matter to a minor by the Internet (Pen. Code,[1] §§ 288.2, subd. (b), 664). He contends his conviction must be reversed because section 288.2, subdivision (b) violates the commerce clause (U.S. Const., art. I, § 8, cl. 3) and the First Amendment of the United States Constitution. We conclude that section 288.2, subdivision (b) passes constitutional muster, and therefore affirm Hsu's conviction.

## BACKGROUND

As a result of an undercover investigation on the Internet, Detective Steven McEwan of the San Jose Police Department child exploitation unit arrested an individual (not Hsu) carrying two pictures of a naked 14-year-old boy. McEwan located the boy in Walnut Creek, and the boy allowed McEwan to use his Internet service provider and assume his screen name. On consecutive days Hsu initiated two "instant messages" with the boy.[2] McEwan, pretending to be the boy, responded. During the ensuing electronic conversations, Hsu sent two photographs of himself, one lying on his bed wearing underwear, and one seated, shirtless and wearing unzipped jeans. He also sent a photograph of an unidentified male in his late teens lying on a bed wearing shorts that had been pulled back to display an erect penis. Hsu offered to engage in specific sexual acts, and invited the boy to meet him at his house. Hsu resides and works in Walnut Creek. The parties do not dispute he initiated the messages from his residence.

Following Hsu's plea, imposition of sentence was suspended, and he was placed on three years' probation. The trial court issued a certification of probable cause for appeal from the conviction. (§ 1237.5, subd. (a).)

---

[1]Unless otherwise indicated, all further section references are to the Penal Code.

[2]An "instant message" is a mechanism used by the boy's Internet service provider that allows individuals in a private chat room to have a "live" communication with each other. A chat room is a discussion forum on a particular topic that allows the participants to engage in "real-time" dialogue, analogous to a telephone party line. (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 851 [117 S.Ct. 2329, 2334, 138 L.Ed.2d 874] (*Reno I*).) A private chat room is limited to the sender and recipient; no one else has access to their dialogue while they are in the "instant message" mode. (*Cyperspace Communications, Inc. v. Engler* (1999 E.D.Mich) 55 F.Supp.2d 737, 743 (*Cyberspace*).)

## DISCUSSION

### Standard of Review

Hsu challenges section 288.2, subdivision (b)[3] as facially unconstitutional under the commerce clause and the First Amendment. ■ "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, [Hsu] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute. . . . Rather, [Hsu] must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' [Citations.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145] (*Tobe*), italics omitted.) In short, a facial challenge must be rejected unless no set of circumstances exists in which the statute can be constitutionally applied.

The exception to this rule is a facial challenge based on First Amendment free speech grounds. Courts "have applied to statutes restricting speech a so-called 'overbreadth' doctrine, rendering such a statute invalid in all its applications (*i.e.*, facially invalid) if it is invalid in any of them." (*Ada, Governor of Guam v. Guam Society of Obstetricians & Gynecologists et al.* (1992) 506 U.S. 1011, 1012 [113 S.Ct. 633, 634, 121 L.Ed.2d 564] (dis. opn. of Scalia, J. to order denying cert.); see also *Gooding v. Wilson* (1971) 405 U.S. 518, 520-521 [92 S.Ct. 1103, 1105-1106, 31 L.Ed.2d 408] [exception applies to claim of vagueness]; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 167 [77 Cal.Rptr.2d 676].) "[T]he defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech. . . ." (*Secretary of State of Md. v. J.H. Munson Co.* (1984) 467 U.S. 947, 967-968 [104 S.Ct. 2839, 2852-2853, 81 L.Ed.2d 786].)

---

[3]Section 288.2, subdivision (b) states: "Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . , or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail. [¶] A person convicted of a second and any subsequent conviction for a violation of this section is guilty of a felony."

Section 313, subdivision (a) defines "harmful matter" as "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

All presumptions and intendments favor the validity of statutes, and they will be upheld unless their unconstitutionality clearly and unmistakenly appears. (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 814 [258 Cal.Rptr. 161, 771 P.2d 1247].)

*The Commerce Clause Challenge*

■ The United States Constitution grants to Congress the power to regulate commerce with foreign nations and among the several states. (U.S. Const., art. I, § 8, cl. 3.) Even if Congress has not specifically regulated an incident of interstate commerce, state laws that unduly burden interstate commerce and thereby impede free private trade in the national marketplace generally violate the so-called dormant commerce clause. (*General Motors Corp. v. Tracy* (1997) 519 U.S. 278, 287 [117 S.Ct. 811, 818, 136 L.Ed.2d 761].)

The Internet is undeniably an incident of interstate commerce,[4] but the fact that communication thereby can affect interstate commerce does not automatically cause a state statute in which Internet use is an element to burden interstate commerce. Absent conflicting federal legislation, states retain their authority under their general police powers to regulate matters of legitimate local concern, even if interstate commerce may be affected. (*Lewis v. BT Investment Managers, Inc.* (1980) 447 U.S. 27, 36 [100 S.Ct. 2009, 2015, 64 L.Ed.2d 702].) The test for determining if a state statute violates the commerce clause is set forth in *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137 [90 S.Ct. 844, 25 L.Ed.2d 174] (*Pike*). "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." (*Id.* at p. 142 [90 S.Ct. at p. 847].)

■ Under the *Pike* test, section 288.2, subdivision (b) does not violate the commerce clause. Statutes affecting public safety carry a strong presumption of validity (*Bibb v. Navajo Freight Lines* (1959) 359 U.S. 520, 524 [79 S.Ct. 962, 964, 3 L.Ed.2d 1003]), and the definition and enforcement of

---

[4]*Reno I, supra,* 521 U.S. at pages 849-853 [117 S.Ct. at pages 2334-2336] contains a detailed explanation of the Internet. In essence the Internet provides worldwide access to an extensive variety of communication and information retrieval methods which in turn allow transmission of text and often sound, pictures and moving images, the content of which is " 'as diverse as human thought.' " (*Id.* at p. 852 [117 S.Ct. at p. 2335], fn. omitted.)

criminal laws lie primarily with states. (*United States v. Lopez* (1995) 514 U.S. 549, 561, fn. 3 [115 S.Ct. 1624, 1630, 131 L.Ed.2d 626].) States have a compelling interest in protecting minors from harm generally and certainly from being seduced to engage in sexual activities. (See *Sable Communications of Cal., Inc. v. FCC* (1989) 492 U.S. 115, 126 [109 S.Ct. 2829, 2836, 106 L.Ed.2d 93] (*Sable*); *Globe Newspaper Co. v. Superior Court* (1982) 457 U.S. 596, 607 [102 S.Ct. 2613, 2620, 73 L.Ed.2d 248].) Conversely, it is difficult to conceive of any legitimate commerce that would be burdened by penalizing the transmission of harmful sexual material to known minors in order to seduce them. To the extent section 288.2, subdivision (b) may affect interstate commerce, its effect is incidental at best and far outweighed by the state's abiding interest in preventing harm to minors.

Relying primarily on *American Libraries Ass'n. v. Pataki* (S.D.N.Y. 1997) 969 F.Supp. 160 (*Pataki*), Hsu argues that section 288.2, subdivision (b) is unconstitutional because it subjects Internet users to inconsistent regulations. At issue in *Pataki* was a New York statute similar to section 288.2, subdivision (b) but without the multiple knowledge and intent elements of the latter.[5] In what is essentially a preemption analysis, *Pataki* concluded the New York statute violated the commerce clause because, inter alia, the nature of the Internet, like that of rail and highway traffic, requires a "cohesive national scheme of regulation so that users are reasonably able to determine their obligations" regarding the kind of material that may be permissibly disseminated thereby. (969 F.Supp. at p. 182.) Absent national regulations, according to *Pataki*, Internet users will be subject to inconsistent local statutes regulating the content of their communications, i.e., the various states may not have a uniform definition of " 'harmful to minors.' " (*Ibid.*)

The knowledge and intent elements missing from the New York statute but present in section 288.2, subdivision (b) significantly distinguish the two statutes. The New York statute broadly banned the communication of harmful material to minors via the Internet. The scope of section 288.2, subdivision (b) is much narrower. Only when the material is disseminated to a *known* minor with the *intent* to arouse the prurient interest of the sender and/or minor and with the *intent* to seduce the minor does the dissemination become a criminal act. The proscription against Internet use for these

---

[5]New York Penal Law section 235.21 made it a felony for an individual "Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, [to] intentionally use[] any computer communication system allowing the input, output, examination or transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor." (*Pataki*, *supra*, 969 F.Supp. at p. 163.) The New York definition of "harmful to minors" is similar to the definition of "harmful matter" in section 313.

specifically defined and limited purposes does not burden interstate commerce by subjecting Internet users to inconsistent regulations. As *Pataki* itself observed, and *People v. Foley* (1999) 257 A.D.2d 243 [692 N.Y.S.2d 248, 256] subsequently held, New York could realistically prosecute violations of New York Penal Law section 235.22(2), which, like section 288.2, subdivision (b), prohibits adults from luring minors into sexual contact via Internet communication of harmful material, without violating the commerce clause. (*Pataki, supra,* 969 F.Supp. at p. 179.)

Again relying primarily on *Pataki,* Hsu argues section 288.2, subdivision (b) violates the commerce clause by regulating behavior occurring wholly outside California. A statute may burden interstate commerce if its effect is to regulate activities beyond the state's borders by exporting the state's domestic policies into other states. (*Edgar v. MITE Corp.* (1982) 457 U.S. 624, 641-643 [102 S.Ct. 2629, 2640-2641, 73 L.Ed.2d 269].) Because the Internet has no geographical limitations, *Pataki* concluded that, with the statute at issue, New York had "deliberately imposed its legislation on the Internet and, by doing so, projected its law into other states whose citizens use the Net." (*Pataki, supra,* 969 F.Supp. at pp. 169, 177.) As *Pataki* hypothesized, a California artist who displayed his work on his Internet Web site to an Oregon purchaser risked prosecution in New York if the work was harmful to minors under New York's definition, because Web siteholders are unable to close their sites to the separate states. (*Id.* at pp. 169, 174, 177.)

When section 288.2, subdivision (b) is harmonized with the entire California penal scheme, it does not effectively regulate activities beyond California. California prosecutes only those criminal acts that occur wholly or partially within the state. (§§ 27, 777, 778, 778a, 778b.) Statutes "must be construed in the light of the general principle that, ordinarily, a state does not impose punishment for acts done outside its territory. [Citations.]" (*People v. Buffum* (1953) 40 Cal.2d 709, 716 [256 P.2d 317].) Section 288.2, subdivision (b) makes no reference to place of performance, so courts must assume the Legislature did not intend to regulate conduct taking place outside the state. (See *Buffum, supra,* at p. 715, see also *People v. Morante* (1999) 20 Cal.4th 403, 424-425 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) Given the historical and statutory limitations on California's ability to prosecute, section 288.2, subdivision (b) cannot be enforced beyond what is jurisdictionally allowed. Consequently, such enforcement would not burden interstate commerce. Accordingly we reject Hsu's commerce clause challenge.

*The First Amendment Challenge*

 Hsu contends section 288.2, subdivision (b) violates the First Amendment because it regulates speech on the basis of content in an impermissibly overbroad and vague manner.

### a. *Content-based or content-neutral law*

■ "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 643 [114 S.Ct. 2445, 2459, 129 L.Ed.2d 497].) A content-based regulation is presumably invalid. (*R.A.V. v. St. Paul* (1992) 505 U.S. 377, 382 [112 S.Ct. 2538, 2542, 120 L.Ed.2d 305].) It may be upheld only upon a showing that it is necessary to serve a compelling state interest and has been narrowly tailored to serve that end. (*Frisby v. Schultz* (1988) 487 U.S. 474, 483 [108 S.Ct. 2495, 2501, 101 L.Ed.2d 420] (*Frisby*).)

Conversely, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. [Citation.] Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.' [Citations.]" (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [109 S.Ct. 2746, 2754, 105 L.Ed.2d 661] (*Ward*).) A content-neutral regulation is upheld if it is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. (*Frisby, supra,* 487 U.S. at p. 481 [108 S.Ct. at p. 2500].)

Thus, the principal inquiry in determining whether a law is content-based or content-neutral "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. [Citation.] The government's purpose is the controlling consideration." (*Ward, supra,* 491 U.S. at p. 791 [109 S.Ct. at p. 2754].) For example, in *Boos v. Barry* (1988) 485 U.S. 312, 322 [108 S.Ct. 1157, 1164, 99 L.Ed.2d 333], the Supreme Court examined the District of Columbia's purpose in prohibiting the display of signs outside a foreign government's embassy, if the sign tended to bring the foreign government into public odium or disrepute. The court concluded the regulation was content-based because the justification for the law focused only on the content of the message and its direct impact on the viewer.

Conversely, *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 48 [106 S.Ct. 925, 929, 89 L.Ed.2d 29] (*Renton*) upheld a zoning ordinance that forbade adult movie theaters in residential neighborhoods because the ordinance was not aimed at the content of the movies but at the secondary effects of the theaters, such as crime and deteriorating property values.

In *Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372 [259 Cal.Rptr. 918] (*Sebago*) we considered whether an ordinance that restricted

the sites of vending machines selling adult newspapers and periodicals was content-based or content-neutral. We did so by examining its stated aims of restricting the access of minors to adult newspapers and prevention of urban blight. (*Id.* at pp 1383-1384.) We concluded the restriction-to-minors aim was content-based because it concerned direct listener reaction to speech. (*Id.* at p. 1384.) Given the absence of demonstrable data that the vending machines downgraded neighborhoods, we concluded the urban blight aim did not make the ordinance content-neutral because, "[u]nlike in *Renton*, Alameda's concern as to purported secondary effects of [the vending machines] was truly 'conclusory and speculative.'" (*Id.* at p. 1385, quoting *Renton, supra*, 475 U.S. at p. 50 [106 S.Ct. at p. 930], fn. omitted.)

Recently, *United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803 [120 S.Ct. 1878, 146 L.Ed.2d 865] (*Playboy*) applied the same analytical standard in deciding whether section 505 of the Communications Decency Act of 1996 (47 U.S.C. § 561) (CDA), requiring cable operators to scramble or block sexually oriented programming, is content-based or content-neutral. The court reasoned that "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers. Section 505 is not ' "justified without reference to the content of the regulated speech." ' [Citations.] It 'focuses only on the content of the speech and the direct impact that speech has on its listeners.' [Citation.]" (529 U.S. at p. 811 [120 S.Ct. at p. 1885].)[6]

Here, we conclude the purpose of section 288.2 cannot be served without referring to the speech it seeks to restrict. The overriding aim of the regulation is to prevent a particular kind of message, i.e., harmful matter, from reaching minors in order to provoke in them a particular reaction, i.e., arousal of sexual desire. The statute cannot be justified without reference to the content of the Internet transmission.

The People attempt to avoid this conclusion by arguing that section 288.2, subdivision (b) regulates conduct and not merely speech. Citing *People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1381-1382 [283 Cal.Rptr. 81], they argue it seeks to deter sexual predators from using the Internet to lure youthful victims in the same way laws prohibiting obscene or annoying telephone calls regulate conduct. However, this argument avoids examining the *primary* effect or *direct* impact of the ordinance—deterring the transmittal of statutorily "harmful" matter to prevent a statutorily specified response

---

[6]The CDA is title V of the Telecommunications Act of 1996 (Pub.L. No. 104-104 (Feb. 8, 1996) 110 Stat. 56, 133-143.) *Playboy* held that section 505 was unconstitutional because the government failed to demonstrate that a less restrictive alternative would be ineffective to achieve the compelling government interest of protecting minors from indecent speech.

in the child-listener or sender. As *Boos v. Barry* stated, "[t]he emotive impact of speech on its audience is not a 'secondary effect.' " (*Boos v. Barry, supra,* 485 U.S. at p. 321 [108 S.Ct. at p. 1164].) If the content of the Internet communication is changed to a communication that does not constitute "harmful matter," such as a free copy of the latest Harry Potter novel,[7] the promise of unlimited purchases at a bakery, or a pair of tickets to a major league baseball game, we see no violation of *this* statute. In short, this regulation proscribes speech, not merely conduct, and is subject to the highest level of scrutiny.[8]

### b. *Overbreadth*

■ Hsu concedes section 288.2, subdivision (b) satisfies the first criterion for a permissible content-based regulation of speech because it serves the compelling interest of protecting children from material harmful to them, even if not obscene by adult standards. (See *Sable, supra,* 492 U.S. at p. 126 [109 S.Ct. at p. 2836]); *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1085 [47 Cal.Rptr.2d 661].) The next question is whether the statute is tailored narrowly enough to serve this interest without unnecessarily interfering with the First Amendment rights of adults. (*Sable, supra,* at p. 126 [109 S.Ct. at p. 2836].)

A statute is narrowly tailored only if the Legislature has chosen the least restrictive means to further the articulated interest. (*Sable, supra,* 492 U.S. at p. 126 [109 S.Ct. at p. 2836].) It must target and eliminate no more than the exact source of the evil it seeks to remedy. (*Frisby, supra,* 487 U.S. at p. 485 [108 S.Ct. at p. 2504]; see also *Playboy, supra,* 529 U.S. at p. 813 [120 S.Ct. at p. 1886].)

Section 288.2, subdivision (b) has been written in a manner that does not impermissibly infringe on the rights of adults to transmit and receive constitutionally protected material via the Internet. The objective of the statute is not simply to protect minors from exposure to the harmful material, but to prevent transmitting the material for the ultimate purpose of seducing them. It is one of many penal statutes by which "the Legislature has evidenced a long-standing and consistent history of specifically protecting minors from

---

[7] The latest volume in the best-selling fantasy series by J. K. Rowling, Harry Potter and the Goblet of Fire, was released on July 8, 2000. (See S.F. Chronicle (July 11, 2000) p. E4.)

[8] The Fourth Appellate District considered this issue and concluded, in a 2-to-1 opinion, that section 288.2, subdivision (b) was content neutral because it was designed to prevent specific conduct—the seduction of minors. (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170 [94 Cal.Rptr.2d 453].) We disagree with this premise in the *Hatch* court's analysis. Rather, as we have stated, the content of the transmitted matter establishes the threshold element of a violation of section 288.2, subdivision (b).

sexual exploitation and predation." (*Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1225 [44 Cal.Rptr.2d 197]; see also *People v. Scott* (1994) 9 Cal.4th 331, 341-342 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) Before it can be violated, the sender must know the recipient is a minor, know the transmitted matter is harmful, intend to arouse the minor's sexual desires, and, most specifically, intend to seduce the minor. The only chilling effect of the statute is on the conduct of those who would use otherwise protected speech to seduce minors. There is no violation of section 288.2, subdivision (b) when an adult disseminates the matter to another adult or to a minor without the intent of seducing the minor recipient.

Moreover, the statute's built-in affirmative defenses further limit its reach so that it targets only those who prey on minors to seduce them. It provides that parents or guardians who transmit the statutorily defined "harmful material" to aid legitimate sex education, or other adults who transmit the material to aid scientific or educational purposes, shall have a defense against prosecution, and it relieves the Internet providers who transmit the material from prosecution entirely. (§ 288.2, subds. (c), (d), (e).)

These limitations on section 288.2, subdivision (b) distinguish it from the statutes found unconstitutionally overbroad in *Reno I, supra,* 521 U.S. 844 and *Cyberspace, supra,* 55 F.Supp.2d 737.

At issue in *Reno I* was another section of the CDA (47 U.S.C. § 223 (a)(1)(B), (a)(2), & (d)), which prohibited either (1) the knowing transmission over the Internet of obscene or indecent communications to recipients known to be under 18, or (2) the knowing use of the Internet to send or display in a manner available to a person under 18 years of age, any communication that depicted sexual or excretory activities or organs, in terms patently offensive as measured by contemporary community standards. (*Reno I, supra,* 521 U.S. at p. 860 [117 S.Ct. at p. 2338].) At issue in *Cyberspace* was a Michigan statute that prohibited knowingly disseminating sexually explicit material harmful to minors via the Internet.

Unlike section 288.2, subdivision (b), neither the CDA nor the Michigan statute was tailored so that the offense was restricted to the transmittal of the proscribed material with the double intent of arousing the minor's sexual desire and seducing the minor, thereby ensuring that adult-to-adult communication was undeterred. Section 288.2, subdivision (b) mandates not only that the accused sender have the particularized intent "of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor," but also that he or she have the particularized intent "of seducing a minor." Thus, section 288.2, subdivision (b), withstands this facial challenge

because it is a narrowly drawn statute that serves a conceded compelling state interest by use of language that restricts "no more than [is necessary to] eliminate the exact source of the evil it [seeks] to remedy." (*City Council v. Taxpayers for Vincent* (1984) 466 U.S. 789, 808 [104 S.Ct. 2118, 2130, 80 L.Ed.2d 772].)

Relying on *Sable, supra,* 492 U.S. 115, Hsu argues that section 288.2, subdivision (b) fails to use the least restrictive means to achieve its goal because the government must show that less restrictive means have been tested over time to determine their validity, and there is no evidence of such testing. Hsu's reliance is misplaced. *Sable* involved a 1988 amendment to a federal statute that imposed a total ban on both indecent and obscene interstate commercial telephone messages, the so-called dial-a-porn. (*Sable, supra,* at p. 117 [109 S.Ct. at p. 2832].) The Federal Communications Commission determined that its credit card, access code, and scrambling rules were feasible and effective in preventing the dial-a-porn messages from reaching minors, but the federal government argued that these rules would not be sufficiently effective because enterprising children could evade them. (*Id.* at p. 128 [109 S.Ct. at p. 2837].) *Sable* disagreed. "There is no evidence in the record before us to that effect, nor could there be since the FCC's implementation of [the statute] prior to its 1988 amendment *has never been tested over time.*" (*Id.* at pp. 128-129 [109 S.Ct. at pp. 2837-2838], italics added.)

The italicized language portion from *Sable* addresses its unique fact pattern: the statute's *total ban* on protected, i.e., indecent, speech in the face of the FCC's application of its rules. *Sable* does not impose a blanket requirement that alternative means must first be tested before restrictions can be placed on protected speech to prevent specific conduct impermissible under any circumstances.

We finally observe that section 288.2, subdivision (b) does not suffer the unconstitutional overbreadth of the Child Online Protection Act of 1998 (47 U.S.C. § 231) (COPA), as the Third Circuit Court of Appeals concluded in *American Civil Liberties Union v. Reno* (3d Cir. 2000) 217 F.3d 162 (*Reno II*). COPA, the successor to CDA, prohibits an individual or entity from knowingly transmitting material harmful to minors via the World Wide Web. (47 U.S.C. § 223(d).) COPA defines "harmful to minors" as, inter alia, material that the average person, "applying contemporary community standards," would find is designed to appeal to, or is designed to pander to, the prurient interest. (47 U.S.C. § 231(e)(6).) *Reno II* affirmed the granting of a preliminary injunction against the enforcement of COPA because of the likelihood it would be declared unconstitutional, given the overbreadth of

the definition of "harmful to minors" applying a "contemporary community standards" clause in the context of the Web medium. It determined that because of the peculiar geography-free nature of cyberspace and the present technological inability of Web publishers to restrict access to their sites based on the geographical locale of Internet users, a "community standards" test would compel every Web publisher, in order to avoid liability, to abide by the most restrictive and conservative state's community's standards, even if that standard were not deemed harmful to minors in all other states. Therefore, *Reno II* concluded, COPA imposes an impermissible burden on constitutionally protected speech. (*Reno II, supra*, 217 F.3d at pp. 173-180.)

Section 288.2, subdivision (b) avoids COPA's unconstitutional overbreadth by gauging whether the published material is harmful to minors on the narrow basis of "contemporary *statewide* standards." (§ 313, subd. (a), italics added.) When *Miller v. California* (1973) 413 U.S. 15, 24 [93 S.Ct. 2607, 2614, 37 L.Ed.2d 419] (*Miller*) emphasized that "community standards," as used to determine whether a work appeals to the prurient interest, are to be construed in a localized geographic context, it implicitly acknowledged that a state constitutes such a "community." "[O]ur Nation is simply too big and too diverse for this Court to reasonably expect that such standards [of what is patently offensive] could be articulated for all 50 states in a single formulation . . . . To require a State to structure obscenity proceedings around evidence of a *national* 'community standard' would be an exercise in futility." (*Id.*, at p. 30.) By restricting the measurement of harmful matter to a contemporary *California* standard, section 288.2, subdivision (b) passes constitutional muster.

c. *Vagueness*

 The remaining question is whether the terms in section 288.2, subdivision (b) make the statute impermissibly vague. The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender v. Lawson* (1983) 461 U.S. 352, 357 [103 S.Ct. 1855, 1858, 75 L.Ed.2d 903]; *Tobe, supra,* 9 Cal.4th at p. 1106.)

To satisfy constitutional requirements, a statute must be sufficiently precise to provide adequate notice of the conduct proscribed and to provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. (*Tobe, supra,* 9 Cal.4th at p. 1106.) However, reasonable certainty is all that is necessary. (*Ibid.*) "[A]ll that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .'

[Citation.]" (*Roth v. United States* (1957) 354 U.S. 476, 491 [77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498].) The challenged terms must be considered in the context of the statute's purpose. (*Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 290-291 [104 S.Ct. 3065, 3067, 82 L.Ed.2d 221]; *Communications Assn. v. Douds* (1950) 339 U.S. 382, 412 [70 S.Ct. 674, 690, 94 L.Ed. 925].) If a reasonable and practical construction can be given to the language of a statute or its terms made reasonably certain by reference to other definable sources, it will not be held void. (*People v. Green* (1991) 227 Cal.App.3d 692, 699 [278 Cal.Rptr. 140].)

Hsu contends the word "seducing" is impermissibly vague because it is not defined, and the phrase "harmful matter" is impermissibly vague because "sexual conduct," one of its terms, is not defined. Although "seduce," as Hsu notes, can mean simply "to lead astray," it is also defined as "persuading into partnership in sexual intercourse." (Webster's 3d New Internat. Dict. (1981) p. 2054.) In the context of section 288.2, subdivision (b), with its references to gratifying lust, passion, and sexual desire, people of ordinary intelligence (see *Beauharnais v. Illinois* (1952) 343 U.S. 250, 253 [72 S.Ct. 725, 728, 96 L.Ed. 919]) would readily understand "seducing" as used here to mean the latter definition.

"Harmful matter," as used in section 288.2, subdivision (b) incorporates the definition from section 313, subdivision (a): "[M]atter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." This definition essentially tracks the three-pronged test for obscenity articulated in *Miller, supra,* 413 U.S. at page 24 [93 S.Ct. at page 2615]: "[1] whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; [2] whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and [3] whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." However, section 313 does not specifically define "sexual conduct" (see second prong), and it adds "to minors" at the conclusion of the third prong.[9]

The omission does not result in section 288.2, subdivision (b) being unconstitutionally vague. First, given that the term "prurient interest" in section 313 is used in conjunction with the intent elements of "arousing,

---

[9]Except for omitting "to minors" at the end of "lacks serious literary [etc.] value," the statutory definition of "obscene matter" (§ 311, subd. (a)) is identical to that of harmful matter in section 313.

appealing to, or gratifying the lust or passions or sexual desires of [and] seducing" in section 288.2, subdivision (b), the meaning of sexual conduct for purposes of the acts proscribed by section 288.2, subdivision (b) "can be objectively ascertained by reference to common experiences of mankind." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1129 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)

Second, the meaning of sexual conduct can easily be made certain by reference to other statutes in companion chapters of the Penal Code dealing with the related subject of obscenity. Section 313 is contained within chapter 7.6, Harmful Matter. Chapter 7.5, entitled Obscene Matter, includes prohibitions against sexual exploitation of a child (§ 311.3) and employment or use of a child to perform prohibited acts (§ 311.4), both of which contain elaborate definitions of "sexual conduct."[10] Insofar as section 288.2, subdivision (b) is among the numerous statutes specifically enacted to protect minors against exploitation and predation (see *Angie M., supra,* 37 Cal.App.4th at p. 1225), the definition of "sexual conduct" used in like statutes permits a reasonable and practical construction of "sexual conduct" as used in section 313 and, by extension, in section 288.2, subdivision (b).

Hsu's argument that the lack of a definition of "sexual conduct" makes section 288.2 unconstitutionally vague is based on *Reno I, supra,* 521 U.S. 844. The CDA at issue in *Reno I* made it illegal, inter alia, to use the Internet to display to persons under 18 years of age any communication that depicted sexual or excretory activities or organs " 'in terms patently offensive as measured by contemporary community standards. . . .' " (*Id.* at p. 860 [117 S.Ct. at p. 2339].) The federal district court concluded that "patently offensive" was unconstitutionally vague. In rebuttal before the Supreme Court, the government argued that the CDA's patently offensive standard was one part of the three-pronged *Miller* test, so could not be unconstitutionally vague. (*Id.* at pp. 862, 872-873 [117 S.Ct. at pp. 2339, 2344-2345].)

*Reno I* concluded the government was factually incorrect because *Miller's* "patently offensive" prong (" 'whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable

---

[10]Section 311.4, subdivision (d)(1) provides that, as used therein, "sexual conduct means any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals. An act is simulated when it gives the appearance of being sexual conduct." Section 311.3, subdivision (b)(1)-(6), is a virtually identical definition of sexual conduct.

state law") (*Reno I, supra*, 521 U.S. at p. 872 [117 S.Ct. at p. 2345]) contained the additional "critical requirement . . . that the proscribed material be 'specifically defined by the applicable state law' [and this] requirement reduces the vagueness inherent in the open-ended term 'patently offensive' as used in the CDA."[11] (*Id.* at p. 873 [117 S.Ct. at p. 2345].) *Reno I* also concluded the government's reasoning was flawed. "Just because a definition including three limitations is not vague, it does not follow that one of those limitations, standing by itself, is not vague. Each of *Miller*'s additional two prongs—(1) that, taken as a whole, the material appeal to the 'prurient' interest, and (2) that it 'lac[k] serious literary, artistic, political, or scientific value'—critically limits the uncertain sweep of the obscenity definition." (*Id.* at p. 873 [117 S.Ct. at p. 2345], fn. omitted.)

The vagueness problems of the CDA's "patently offensive" standard are not present in sections 288.2, subdivision (b) and 313. As previously discussed, section 313, unlike the CDA, contains, in essence, all three *Miller* prongs. Additionally, the terms of the two statutes may be made clear by considering their purpose and by referring to other related state statutes. Hsu's First Amendment challenge on vagueness grounds likewise fails.

## DISPOSITION

The judgment is affirmed.

Stevens, J., and Kramer, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied November 29, 2000. Kennard, J., was of the opinion that the petition should be granted.

---

[11]Under the usual rules of grammar and usage, "specifically defined by the applicable state law" as used in *Miller*'s second prong—"whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"—would appear to modify "sexual conduct" only. In fact, *Miller* gives two examples of what a state statute could define for purposes of its second prong: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. [¶] (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." (*Miller, supra*, 413 U.S. at p. 25 [93 S.Ct. at p. 2615].) These examples imply that the statute must define only "sexual conduct." *Reno I*'s use of the phrase "*proscribed material*" suggests the applicable state statute must have a broader scope, i.e., that the statute define the entire phrase "work depicting sexual conduct in a patently offensive way." (*Reno I, supra*, 521 U.S. at p. 873 [117 S.Ct. at p. 2345]; *Miller, supra*, at p. 25 [93 S.Ct. at p. 2615].)

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.