944 So.2d 317 (2006)
Michael John SIMMONS, Petitioner,
v.
STATE of Florida, Respondent.
No. SC04-2375.
Supreme Court of Florida.
November 16, 2006.
*321 William J. Sheppard, D. Gray Thomas and Matthew R. Kachergus of Sheppard, White and Thomas, P.A., Jacksonville, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Robert R. Wheeler, Bureau Chief, Criminal Appeals, Charlie McCoy, Senior Assistant Attorney General, Tallahassee, FL, for Appellee.
QUINCE, J.
We have for review a decision of a district court of appeal that expressly declares a state statute valid. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons explained below, we approve the decision of the First District Court of Appeal in Simmons v. State, 886 So.2d 399 (Fla. 1st DCA 2004).

FACTS AND PROCEDURAL HISTORY
This case involves the prosecution of Michael John Simmons for luring or enticing a child by use of an online service in violation of section 847.0135, Florida Statutes (2002),[1] and for transmission of material harmful to a minor in violation of section 847.0138, Florida Statutes (2002).[2] On July 1, 2002, Columbia County Sheriff's Deputy Kenneth Neff posed as a thirteen-year-old girl named "Sandi" in an Internet chat room entitled "I like older men." An online conversation ensued between "Sandi" and Simmons, who was located in Virginia. After "Sandi" identified herself as a thirteen-year-old girl residing in Florida, Simmons repeatedly communicated with "Sandi" about sexual activities, sent nude pictures of himself to "Sandi," asked "Sandi" to send him a pair of her panties, offered to teach "Sandi" about sex, encouraged "Sandi" to meet him for sexual activities, and eventually made a trip to Lake City, Florida, to meet "Sandi" for three days of sexual activities at a motel. When Simmons arrived at the Lake City motel, he was arrested by members of the Columbia County Sheriff's Office.
Simmons was charged with one count of luring or enticing a child by use of an online service in violation of section 847.0135, one count of transmission of material harmful to a minor in violation of section 847.0138, and one count of carrying a concealed firearm in violation of section 790.01(2), Florida Statutes (2002). Simmons moved to dismiss the first two counts on the grounds that the statutes are unconstitutional, that his prosecution under both statutes constituted a double jeopardy violation, and that the trial court lacked jurisdiction to proceed on the matter. The trial court denied the motions to dismiss. Simmons pled no contest to these counts and reserved his right to appeal the denial of his motions to dismiss. He was sentenced *322 to two concurrent five-year terms of probation.
On appeal, Simmons brought facial constitutional challenges to sections 847.0135 and 847.0138. See Simmons v. State, 886 So.2d 399 (Fla. 1st DCA 2004).[3] Simmons challenged section 847.0138 as violating the First and Fourteenth Amendments of the United States Constitution and article I, sections 4 and 9 of the Florida Constitution. Simmons did not argue that the government lacks a compelling interest in protecting the physical and psychological well-being of children, but instead argued that section 847.0138 is overbroad because it "limits communications on the Internet to those which would only be suitable for children, thereby depriving adults of their constitutional right to engage in protected speech." Id. at 403. The First District Court of Appeal rejected this argument, finding that because the statute requires the defendant to have actual knowledge or to believe that the recipient of the communication is a minor, it does not deprive adults of their constitutional right to engage in protected speech and that only communications to minors are prohibited by the statute. Id. The First District also concluded that the statute does not have a chilling effect on First Amendment speech between adults in Internet chat rooms. Id. at 404. The First District found that the statute does not prohibit information posted on websites directed to the public as the prohibited communication from an adult to a minor must be transmitted via electronic mail, which means that the message "must be specifically addressed to the individual, whether in instant messaging or e-mails sent and read at different times." Id. While the First District acknowledged that a similar federal statute, the Communications Decency Act of 1996, had been declared unconstitutional in Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), the court concluded that the federal law differed from Florida's statute because the federal law contained no provision limiting prohibited transmissions to those sent "to a specific individual known by the defendant to be a minor via electronic mail." Simmons, 886 So.2d at 405 (quoting § 847.0138(1)(b)). The First District noted that the federal law struck down in Reno had included transmissions to a group that was likely to include a minor, while the Florida statute only prohibits messages harmful to minors that are sent to a specific individual known or believed to be a minor. Id.
The First District also rejected Simmons' argument that the statute is impermissibly vague because it applies to all minors without attempting to classify materials differently for various age groups of minors. The First District concluded that it is within the Legislature's power to determine that certain matter is harmful to all minors and that the Legislature has the authority to protect all children, even the older ones. Id. The First District also concluded that neither statute violates the Dormant Commerce Clause, and cited its recent opinion in Cashatt v. State, 873 So.2d 430 (Fla. 1st DCA 2004),[4] for this proposition. Simmons, 886 So.2d at 406. Judge Browning concurred with the majority on the constitutionality of section 847.0135, but dissented as to section 847.0138. Judge Browning found that the transmission statute was not narrowly tailored to serve a compelling state interest, is void for vagueness and overbreadth, and *323 violates the Commerce Clause. Simmons, 886 So.2d at 407-14 (Browning, J., concurring in part and dissenting in part).
Simmons sought review by this Court on the basis that the First District's decision expressly declares a state statute to be valid. We granted review and heard oral argument from the parties on the constitutionality of both statutes.

LAW AND ANALYSIS
Simmons contends that section 847.0138, the transmission statute, violates First Amendment principles regarding free speech and is also vague and overbroad. He also contends that both the transmission statute and the luring statute, section 847.0135, violate the Dormant Commerce Clause. We consider each challenge in turn below. The First District's rulings on the constitutionality of the statutes are subject to de novo review by this Court. See City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002) (stating that constitutionality of a state statute is a pure question of law subject to de novo review).

1. First Amendment Challenge
The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I. Florida's Constitution similarly provides that "[n]o law shall be passed to restrain or abridge the liberty of speech." Art. I, § 4, Fla. Const. A regulation that abridges speech because of the content of the speech is subject to the strict scrutiny standard of judicial review. See, e.g., Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Mitchell v. Moore, 786 So.2d 521, 527 (Fla.2001). Strict scrutiny also applies to content-based regulation of Internet speech. See Reno v. ACLU, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (stating that "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium"). "Sexual expression which is indecent but not obscene is protected by the First Amendment. . . ." Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). However, the state may regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. See United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); Sable Commc'ns, 492 U.S. at 126, 109 S.Ct. 2829. The state has a "compelling interest in protecting the physical and psychological well-being of minors," which "extends to shielding minors from the influence of literature that is not obscene by adult standards." Sable Commc'ns, 492 U.S. at 126, 109 S.Ct. 2829. In doing so, however, the means must be narrowly tailored to achieve that end so as not to unnecessarily deny adults access to material which is constitutionally protected indecent material. No similar tailoring is required when the material is obscene material, which is not protected by the First Amendment. See Ashcroft v. Free Speech Coal., 535 U.S. 234, 244-45, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).
Simmons also challenges the transmission statute as vague and overbroad. As this Court has explained, "the doctrines of overbreadth and vagueness are separate and distinct." Southeastern Fisheries Ass'n v. Dep't of Natural Res., 453 So.2d 1351, 1353 (Fla.1984). The overbreadth doctrine applies only if the legislation is susceptible of application to conduct protected by the First Amendment. Id. The overbreadth doctrine contemplates the pragmatic judicial assumption that an *324 overbroad statute will have a chilling effect on protected expression. See City of Daytona Beach v. Del Percio, 476 So.2d 197, 202 (Fla.1985). As the United States Supreme Court has explained, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Put another way, statutes cannot be so broad that they prohibit constitutionally protected conduct as well as unprotected conduct. Firestone v. News-Press Publ'g Co., 538 So.2d 457, 459 (Fla.1989).
The vagueness doctrine has a broader application because it was developed to ensure compliance with the Due Process Clause in the Fifth Amendment of the United States Constitution.[5] Florida's Constitution includes a similar due process guarantee in article I, section 9.[6] A criminal law may violate due process if it fails to give a potential offender fair notice that his contemplated conduct is forbidden or if it encourages arbitrary enforcement and gives the police too much discretion in determining whether it is applicable to a particular individual. When the law fails these tests, it is "void for vagueness." Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Because of its imprecision, a vague statute may also invite arbitrary or discriminatory enforcement. See Southeastern Fisheries, 453 So.2d at 1353. A statute is not void for vagueness if the language conveys a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Hitchcock v. State, 413 So.2d 741, 747 (Fla.1982) (quoting United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)). However, the Supreme Court has indicated that a statute that lends itself to arbitrary enforcement can be void for vagueness even if it gives fair notice of what conduct it prohibits. See Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (stating that the "more important aspect of the vagueness doctrine is not actual notice, but the . . . requirement that a legislature establish minimal guidelines to govern law enforcement") (internal quotation marks omitted). Further, the need for definiteness is even greater when the ordinance imposes criminal penalties on individual behavior or when it implicates constitutionally protected rights.
Section 847.0138, Florida Statutes (2002), provides:
(1) For purposes of this section:
(a) "Known by the defendant to be a minor" means that the defendant had actual knowledge or believed that the recipient of the communication was a minor.
(b) "Transmit" means to send to a specific individual known by the defendant to be a minor via electronic mail.
(2) Notwithstanding ss. 847.012 and 847.0133, any person in this state who knew or believed that he or she was transmitting an image, information, or data that is harmful to minors, as defined in s. 847.001, to a specific individual known by the defendant to be a minor in this state commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(3) Notwithstanding ss. 847.012 and 847.0133, any person in any jurisdiction *325 other than this state who knew or believed that he or she was transmitting an image, information, or data that is harmful to minors, as defined in s. 847.001, to a specific individual known by the defendant to be a minor in this state commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
The provisions of this section do not apply to subscription-based transmissions such as list servers.
The term "harmful to minors" is defined in section 847.001(6), Florida Statutes (2002), and incorporates the constitutional standard for obscenity established by the United States Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as modified for juveniles in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The statute provides:
"Harmful to minors" means any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:
(a) Predominantly appeals to the prurient, shameful, or morbid interest of minors;
(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
(c) Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.
§ 847.001(6), Fla. Stat. (2002). This statutory definition of "harmful to minors" both narrows the scope of section 847.0138 and makes it more precise. The scope of section 847.0138 is further narrowed by the definition of "transmits," which requires that the harmful materials be "sen[t] to a specific individual known by the defendant to be a minor via electronic mail." § 847.0138(1)(b), Fla. Stat. (2002).
Thus, electronic mail is the only regulated transmission mechanism.[7] The terms of the statute specifically exempt subscription-based transmissions such as list servers from its provisions. The posting of materials deemed harmful to minors on a website directed to the public is not "electronic mail," and thus does not violate the statute. Simmons, 886 So.2d at 404; see also Richard H. Martin, State Regulation of Pornographic Internet Transmissions: The Constitutional Questions Raised by Senate Bill 144, 29 Fla. St. U.L.Rev. 1109, 1117 (2002). Additionally, the statute incorporates a knowledge element, requiring the sender to actually know or believe that the recipient of the communication is a minor who is located in Florida. § 847.0138(1)(a), (2)-(3).
Simmons argues that section 847.0138 suffers the same constitutional infirmities as the Communications Decency Act of 1996(CDA), which the United States Supreme Court struck down in Reno v. ACLU, and the Child Online Protection Act (COPA), which the Supreme Court found likely to fail a First Amendment challenge in Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). The CDA prohibited the transmission in interstate or foreign communications of obscene or indecent images to any recipient under eighteen years of age. 47 U.S.C. § 223(a)(1)(B) (2000). The CDA also prohibited knowingly sending patently offensive material to persons under eighteen or displaying patently offensive material *326 in a manner that was available to persons under eighteen. Id. § 223(d). The CDA provided two affirmative defenses for persons who made good faith efforts to restrict minors' access to the prohibited material by using existing technology or designated forms of age proof. Id. § 223(e)(5). The Supreme Court struck down the CDA as a content-based regulation of speech that was unconstitutionally vague and overbroad. See Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The Supreme Court identified a number of constitutional infirmities of the CDA, including ambiguity as to its scope based on the statute's failure to define the terms "indecent" and "patently offensive" and its failure to provide guidance as to whether these determinations should be made with respect to minors or to the population as a whole. Id. at 871 & n. 37, 117 S.Ct. 2329. The Supreme Court found this vagueness challenge of special concern because the CDA could have a chilling effect on free speech and because it imposed criminal sanctions for violating its terms. Id. at 871-72, 117 S.Ct. 2329. The Supreme Court concluded that the vagueness problem was not cured by the CDA's inclusion of one part of the three-prong Miller test[8] for obscenity. 521 U.S. at 872-74, 117 S.Ct. 2329. The Supreme Court also found the CDA to be overbroad because it had the potential of suppressing a large amount of protected adult speech in pursuit of protecting children from potentially harmful materials. Id. at 875, 117 S.Ct. 2329. The Supreme Court expressed concern about the "wholly unprecedented" breadth of the CDA's coverage, noting that its "open-ended prohibitions" applied to commercial entities, nonprofit groups and individual users alike, that it included "large amounts of nonpornographic material with serious educational or other value," that it would be "judged by the standards of the community most likely to be offended by the message," and that it made no accommodation for parental choice. Id. at 877-78, 117 S.Ct. 2329. The Supreme Court further concluded that the CDA was not "narrowly tailored" because it had not considered less restrictive alternatives, such as "tagging" indecent material to facilitate parental control of what material is accessed, making exceptions for messages with artistic or educational value, providing some tolerance for parental choice, and regulating commercial websites differently from other portions of the Internet. Id. at 879, 117 S.Ct. 2329.
In response to Reno, Congress passed the Child Online Protection Act (COPA). 47 U.S.C. § 231 (2000). COPA imposed criminal penalties for knowingly posting commercial web content that is harmful to minors. "Harmful to minors" was defined more extensively by COPA to include obscene materials as well as a variation of the Miller standard;[9] "minors" were defined *327 as any persons under seventeen years. COPA also included an affirmative defense to those who employed specified means to prevent minors from accessing their websites, including using credit cards or similar devices to access the site, accepting a digital certificate of age, or employing similar technology to verify age. Despite these changes, the Supreme Court upheld a preliminary injunction to prevent enforcement of COPA pending a full trial on the merits. See Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). The Supreme Court noted that "there are a number of plausible, less restrictive alternatives to the statute," including blocking and filtering software which would "impose selective restrictions on speech at the receiving end, not universal restrictions at the source." Id. at 666-67, 124 S.Ct. 2783.
We find that Florida's Internet transmission statute differs from the CDA and COPA in several significant respects. First, section 847.0138 does not apply broadly to all materials posted on the Internet or sent via electronic mail. The statute provides that the prohibited communications must be sent via electronic mail to a specific individual known by the sender to be a minor. Thus, the concerns expressed in Reno about the CDA's application to all communications on the Internet are not implicated by the Florida statute. Nor does the Florida statute cover web postings directed at the public as COPA did. Second, section 847.0138 defines what constitutes materials "harmful to minors" with reference to the three-prong Miller standard, unlike the CDA, which did not define the vague terms "indecent" and "patently offensive" and incorporated only one prong of the Miller test. The Miller definition specifically excludes works that have serious literary, artistic, political, or scientific value to minors. See Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). So does Florida's statute. See § 847.001(6)(c), Fla. Stat. (2002) (providing that material that is "harmful to minors" is "without serious literary, artistic, political, or scientific value for minors"). Finally, section 847.0138 restricts its applicability to electronic mail, thereby treating portions of the Internet differently as the Supreme Court cited with approval in Reno. 521 U.S. at 865, 868, 877, 117 S.Ct. 2329. Because section 847.0138 only applies to electronic mail sent to a specific individual that the defendant actually knows is a minor or believes is a minor, and not to messages sent to a group that is "likely" to include a minor, we agree with the First District's conclusion that the transmission statute does not suppress adult-to-adult speech. See Simmons, 886 So.2d at 404-05.
A number of other states have also enacted criminal statutes regulating Internet communications, including California, Michigan, New York, New Mexico, Ohio, South Carolina, Virginia, and Vermont. These statutes fall into two general categories: dissemination statutes which prohibit the transmission of materials considered harmful to a minor by computer over the Internet and luring statutes which prohibit use of the Internet to communicate with minors with the intent to seduce them. See Chin Pann, The Dormant Commerce *328 Clause and State Regulation of the Internet: Are Laws Protecting Minors from Sexual Predators Constitutionally Different Than Those Protecting Minors from Sexually Explicit Materials?, 2005 Duke Law & Tech. Rev. 8, ¶ 1 (2005). Some of the dissemination statutes are similar to section 847.0138 in prohibiting the transmission of sexually oriented materials to minors via the Internet. See, e.g., N.M. Stat. § 30-37-3.2(A) (2004);[10] N.Y. Penal Law § 235.21(3) (McKinney 2000).
Simmons notes that many of these state dissemination statutes have been invalidated by federal courts on the basis that the statutes violate the First Amendment. See, e.g., PSINet, Inc. v. Chapman, 362 F.3d 227, 233-39 (4th Cir.2004) (finding Virginia dissemination statute was overbroad and not narrowly tailored); Am. Booksellers Found. v. Dean, 342 F.3d 96, 102 (2d Cir.2003) (same as to Vermont dissemination statute); Southeast Booksellers Ass'n v. McMaster, 371 F.Supp.2d 773, 781-84, 784-86 (D.S.C.2005) (striking down South Carolina dissemination statute for violating the First Amendment); Bookfriends, Inc. v. Taft, 223 F.Supp.2d 932 (S.D.Ohio 2002) (finding Ohio dissemination statute was overbroad in violation of the First Amendment); Cyberspace Commc'ns, Inc. v. Engler, 142 F.Supp.2d 827, 830-31 (E.D.Mich.2001) (same as to Michigan dissemination statute). Simmons contends that the Florida statutes should meet a similar fate.
However, many of the state statutes involved in the cases cited by Simmons have included the Internet regulation as part of a much broader statute that also prohibits the dissemination of such materials to minors by almost all means, i.e., selling, renting, or lending pictures, photographs, books, or magazines or exhibiting a motion picture or selling an admission ticket to a minor, and not just by transmission via computer or electronic mail. See, e.g., Mich. Comp. Laws Ann. § 722.675 (West Supp.2006); S.C.Code Ann. § 16-15-385 (2003); Vt. Stat. Ann. tit. 13, § 2802a (Supp.2006); Va.Code Ann. § 18.2-391 (2004).
Additionally, we find other important distinctions between the state dissemination statutes struck down by the federal courts and the Florida statute at issue here. The dissemination statutes at issue in Southeast Booksellers, American Booksellers, and Cyberspace Communications applied broadly to the dissemination of all digital electronic files to minors via the Internet. This included not only electronic communications directed to a specified individual, but also automatic mailing list services, newsgroups, chat rooms, and websites published for general public access. The Virginia dissemination statute at issue in PSINet applied to all electronic files provided for commercial purposes, without regard to the manner of transmission or dissemination. The New Mexico dissemination statute at issue in ACLU v. Johnson, 194 F.3d 1149, 1159 (10th Cir. 1999), was so broad that it rendered virtually all Internet communications violative of the statute. In contrast, Florida's dissemination statute applies narrowly to electronic mail sent to a specific individual that the sender knows or believes to be a minor and only applies to material that meets the three-prong definition of being "harmful to minors."
In light of these cases and the First Amendment principles discussed above, we reach the following conclusions *329 about section 847.0138. Florida's transmission statute is a content-based regulation of speech and thus subject to strict scrutiny. However, the State has a compelling interest in protecting the physical and psychological well-being of minors from harmful materials. Further, the statute is narrowly tailored to promote this compelling interest as it only applies to communications sent via "electronic mail" to a specific individual that the sender either knows or believes to be a minor. To the extent that the term "electronic mail" is not sufficiently defined by the statute, we interpret it as including both email and instant message communications sent to a specific individual. Thus, the statute does not apply to websites or other materials posted on the Internet for general public viewing. Nor does the statute regulate all portions of the Internet with the same broad brush.
We further conclude that the term "harmful to minors" is adequately defined by reference to the three-prong Miller standard, albeit modified to apply to minors. Under this statutory definition, material is "harmful to minors" if it depicts "nudity, sexual conduct, or sexual excitement" that (1) "[p]redominantly appeals to the prurient, shameful, or morbid interests of minors," (2) is "patently offensive" to the "prevailing standards in the adult community" as to "what is suitable material for minors," and (3) as a whole "is without serious literary, artistic, political, or scientific value for minors." § 847.001(6). Considered together, these three prongs "limit the uncertain sweep" of the definition. Reno, 521 U.S. at 873, 117 S.Ct. 2329 (explaining that inclusion of one of the Miller prongs did not cure the vagueness of the CDA). As the Supreme Court explained in Reno, the "societal value" requirement in the third Miller prong is "particularly important" because it "allows appellate courts to impose some limitations and regularity on the definition [of `harmful to minors'] by setting, as a matter of law, a [uniform] floor for socially redeeming value." Id.
This "societal value" requirement excludes a host of materials from the ambit of the statute and negates any claim that the statute is unconstitutionally overbroad. Transmissions in the aid of legitimate scientific or educational purposes would not meet the third prong of being "without serious literary, artistic, political, or scientific value for minors." Thus, a depiction of Michelangelo's David transmitted for an art history class would not meet the statutory definition. Nor would an illustration of human genitalia intended for a sex education or biology class. See Simmons, 886 So.2d at 409 (Browning, J., concurring in part and dissenting in part). In sum, the scope of the statute is sufficiently limited by its terms, thereby negating Simmons' vagueness and overbreadth challenges.

2. Dormant Commerce Clause Challenges
The United States Constitution gives Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This is commonly referred to as the Commerce Clause. Concomitant with this grant of authority to Congress, the United States Supreme Court has recognized a dormant aspect of the Commerce Clause that limits the states' power to regulate interstate commerce even in the absence of federal legislation. This aspect is referred to as the Dormant Commerce Clause and was recognized by the Supreme Court sometime in the early 1800s. See Willson v. Black-Bird Creek Marsh Co., 27 U.S. (2 Pet.) 245, 7 L.Ed. 412 (1829) (explicitly recognizing the negative aspect of the Commerce Clause); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 *330 L.Ed. 23 (1824) (disposing of case on Supremacy Clause grounds, but stating in dictum that the Commerce Clause might include a prohibition on the states' ability to regulate interstate commerce).
Dormant Commerce Clause jurisprudence has evolved over time, but still attempts to balance the states' local interests against a concern for uniformity of regulation. Under the current jurisprudence, statutes that openly discriminate against out-of-state economic interests in order to protect in-state interests are subject to a per se rule of invalidity. Statutes that are facially neutral but impose an incidental burden on interstate commerce are analyzed under the Pike balancing test, which provides:
Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (citation omitted).
There are also two other aspects of the Dormant Commerce Clause that are important to the assessment of a state statute that regulates the Internet: whether the state law regulates extraterritorially and whether the state law leads to inconsistent regulatory burdens. In Healy v. Beer Institute, Inc., 491 U.S. 324, 336-37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), the Supreme Court articulated a three-prong analysis to determine whether a state law regulates outside the state's borders:
First, the "Commerce Clause. . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. . . . Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.
(Citations omitted.) The "critical inquiry" in such extraterritorial effect cases "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Id. at 336, 109 S.Ct. 2491. Federal courts have also invalidated state statutes under the Dormant Commerce Clause because the statutes potentially subject an area of interstate commerce, namely rail and highway traffic, to inconsistent state regulations. See, e.g., Morgan v. Virginia, 328 U.S. 373, 386, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946) (invalidating a state law that required a reseating of passengers on interstate buses entering Virginia in order to comply with a local segregation law because it interfered with "the need for national uniformity in the regulations for interstate travel"); Southern Pac. Co. v. Arizona ex. rel. Sullivan, 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (concluding that an Arizona *331 statute limiting the length of trains in the state was an unconstitutional burden on interstate commerce "because of the need of national uniformity").
The seminal case involving a Dormant Commerce Clause analysis of a state Internet regulation is American Libraries Ass'n v. Pataki, 969 F.Supp. 160, 181 (S.D.N.Y.1997), which involved a New York dissemination statute. The statute prohibited the use of a computer to disseminate sexually oriented materials deemed harmful to minors. Harmful to minors was statutorily defined by using the Miller test. The New York statute also contained a number of affirmative defenses, including that the dissemination was for scientific, educational, governmental or similar uses, that the sender made a reasonable effort to ascertain the true age of the recipient, that the sender made a good faith effort to restrict access by minors, that access to the site was restricted by some form of age verification, or that the defendant labeled the material so that it could be blocked by software. The federal district court concluded that the Internet "represents an instrument of interstate commerce, albeit an innovative one." Id. at 173. Thus, the court concluded, the "regulation of the Internet impels traditional Commerce Clause considerations." Id. First, the court concluded that New York had overreached by enacting a law that sought to regulate conduct occurring outside its borders, thereby violating the Commerce Clause by virtue of its extraterritorial effects. The court noted that the nature of the Internet makes it impossible to restrict the effects of the New York statute to conduct occurring within New York. Id. at 177. Second, the court concluded that under the Pike balancing test, the burdens that the statute imposed on interstate commerce were excessive in relation to the local benefits it conferred. Id. While the court recognized that protecting children against pedophilia is "a quintessentially legitimate state objective," id., the local benefits likely to result from the statute were "attenuated" because it would have no effect on communications originating outside the United States, the prosecution of out-of-state parties who violate the statute but whose only contact with New York occurs via the Internet was beset with practical and jurisdictional difficulties, and other New York statutes existed to protect children against sexual exploitation. Id. at 178-79.
In contrast, the court identified a number of burdens on interstate commerce: the chilling effect of the statute was bound to exceed actual cases likely to be prosecuted; Internet users would either have to self-censor or risk prosecution, which would impose an unreasonable restriction on interstate commerce; and the costs associated with trying to comply with the statutory defenses would be excessive. Id. at 179-80. Finally, the court concluded that the statute unconstitutionally subjected interstate use of the Internet to inconsistent regulations. Id. at 181. The court noted that there are differing community standards as to what is "harmful to minors," yet Internet users cannot foreclose access to their work from certain states or send differing versions of a communication to different jurisdictions. Id. at 182-83. Because "[f]urther development of the Internet requires that users be able to predict the results of their Internet use with some degree of assurance," the court struck down the New York statute as a violation of the Commerce Clause. Id. at 183. Other federal courts have relied on the Pataki analysis to conclude that other state dissemination statutes also violate the Dormant Commerce Clause. See, e.g., PSINet, Inc. v. Chapman, 362 F.3d 227, 239-40 (4th Cir.2004); ACLU v. Johnson, 194 F.3d 1149, 1160-62 (10th Cir.1999); *332 Cyberspace Commc'ns, Inc. v. Engler, 142 F.Supp.2d 827, 830-31 (E.D.Mich.2001).
Simmons argues that these cases support his Dormant Commerce Clause challenge to the Florida transmission statute. However, we note important distinctions between the Florida statute at issue here and the dissemination statutes struck down under the Pataki Dormant Commerce Clause analysis. The New York statute applied to all Internet disseminations, including those sent by mail exploders or list servers, members of news-groups, or participants in chat rooms, as well as material posted on websites. As the district court explained in Pataki,
no aspect of the Internet can feasibly be closed off to users from another state. An internet user who posts a Web page cannot prevent New Yorkers or Oklahomans or Iowans from accessing that page and will not even know from what state visitors to that site hail. Nor can a participant in a chat room prevent other participants from a particular state from joining the conversation. Someone who uses a mail exploder is similarly unaware of the precise contours of the mailing list that will ultimately determine the recipients of his or her message, because users can add or remove their names from a mailing list automatically. Thus, a person could choose a list believed not to include any New Yorkers, but an after-added New Yorker would still receive the message.
969 F.Supp. at 171. Significantly, the district court recognized that e-mail, "because it is a one-to-one messaging system, stands on a slightly different footing than the other aspects of the Internet." Id.
At least two other federal courts have engaged in a different Dormant Commerce Clause analysis, albeit still concluding that the state statutes in question violated the Dormant Commerce Clause. In American Booksellers Foundation v. Dean, 342 F.3d 96 (2d Cir.2003), the Second Circuit concluded that the Vermont dissemination statute violated the Dormant Commerce Clause because of its extraterritorial effect. Id. at 102-04. The court noted that "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without `project[ing] its legislation into other States.'" Id. at 103 (quoting Healy v. Beer Inst., 491 U.S. 324, 334, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)). The court declined to apply the Pike balancing test because it concluded that the extraterritorial effect resulted in a per se violation of the Dormant Commerce Clause. Id. at 104. Similarly, in Southeast Booksellers Ass'n v. McMaster, 371 F.Supp.2d 773, 786-87 (D.S.C.2005), the district court focused on the unique nature of the Internet in its Dormant Commerce Clause analysis. The court noted that "Internet speakers have no practical, reliable means of determining the geographic location of the recipients of their online communications" nor any way of "ensuring their communications are not accessed in a certain geographic location." Id. at 787. Thus, the court concluded, South Carolina's act was invalid because it placed an undue burden on interstate commerce by regulating commerce occurring wholly outside of South Carolina. Id.
In contrast to these other state statutes found to violate the Dormant Commerce Clause, the Florida dissemination statute at issue here applies only to electronic mail. Thus, the access problems related to web pages, chat rooms, and mail exploders are not at issue as these methods of transmission are not covered by the Florida statute. Furthermore, the Florida transmission statute provides that the sender who transmits the e-mail containing material that is harmful to minors must *333 either know or believe that the specific individual who is the recipient of the e-mail is a minor located in Florida. § 847.0138(3). This statutory requirement narrows the reach of the Florida statute and negates the geographic location problems related to the state dissemination statutes invalidated by the federal courts. In light of these significant distinctions, we conclude that section 847.0138 does not violate the Dormant Commerce Clause.
Simmons also challenges Florida's luring statute as violating the Dormant Commerce Clause. The First District rejected this challenge with citation to its prior opinion in Cashatt v. State, 873 So.2d 430 (Fla. 1st DCA 2004). In Cashatt, the First District found no violation under the Pike balancing test. Id. at 436. The court reasoned that "[t]he state has a compelling interest in protecting minors from being seduced to perform sexual acts, and no legitimate commerce is burdened by penalizing the transmission of harmful sexual material to known minors in order to seduce them." Id. The court found the effect of the luring statute on interstate commerce to be "incidental at best" and "far outweighed by the state's interest in preventing harm to minors." Id. Finally, the court found that the statute does not burden Internet users with inconsistent state regulations because the "intent to seduce" element narrows the scope of the statute. Id.
Several state courts have upheld state Internet regulations against similar Commerce Clause challenges. See, e.g., People v. Hsu, 82 Cal.App.4th 976, 99 Cal.Rptr.2d 184, 189 (2000); Hatch v. Superior Court, 80 Cal.App.4th 170, 94 Cal.Rptr.2d 453 (2000); People v. Foley, 94 N.Y.2d 668, 709 N.Y.S.2d 467, 731 N.E.2d 123 (2000); People v. Barrows, 273 A.D.2d 246, 709 N.Y.S.2d 573 (N.Y.App.Div.2000). Like the First District in Cashatt, these other state courts have viewed the intent element of their statutes as a crucial distinguishing factor. See Hatch, 94 Cal. Rptr.2d at 473 (finding statute did not burden interstate commerce in light of requirements that those charged must intend to seduce and commit at least an attempt to do so in California); Foley, 709 N.Y.S.2d 467, 731 N.E.2d at 132-33 (distinguishing the challenged statute from the provision struck down in Pataki because of the additional luring prong contained in the challenged statute); State v. Snyder, 155 Ohio App.3d 453, 801 N.E.2d 876, 886 (2003) (concluding that the luring element in Ohio's statute made it a valid exercise of state's police power). These courts have also concluded that no "legitimate commerce . . . is derived from the intentional transmission of sexually graphic images to minors for the purpose of luring them into sexual activity" and such conduct "deserves no `economic' protection." Foley, 709 N.Y.S.2d 467, 731 N.E.2d at 133; accord Hatch, 94 Cal.Rptr.2d at 472-73 (stating complete agreement with Foley on this point; concluding any burdens imposed by the California statute "are not upon any protected right of commerce at all"); see also State v. Backlund, 672 N.W.2d 431, 438 (N.D.2003) (stating that there was no legitimate commerce burdened by North Dakota's luring statute).
While the Hsu court also concluded that California's luring statute did not violate the Commerce Clause, the court recognized that the "Internet is undeniably an incident of interstate commerce," and thus the defendant's Commerce Clause claim was examined under the Pike balancing analysis. 99 Cal.Rptr.2d at 190. Under this analysis, the Hsu court concluded that the state has a compelling interest in protecting minors from being seduced to engage in sexual activities, that no legitimate commerce would be burdened by penalizing the transmission of harmful sexual material *334 to known minors in order to seduce them, and that, when harmonized with the entire California penal scheme, the California luring statute "does not effectively regulate activities beyond California." Id. at 190-91.
Florida's luring statute prohibits knowingly using a computer online service "to seduce, solicit, lure, or entice" a minor residing in Florida, or a person believed to be a minor residing in Florida, to commit sexual acts proscribed by other Florida statutes, including sexual battery, lewd and indecent exposure, or child abuse. § 847.0135(3), Fla. Stat. (2002). The statute also prohibits any attempt to do the same.
We conclude that this luring statute does not violate the Dormant Commerce Clause. The State has a compelling interest in protecting minors from being lured to engage in illegal sexual acts. We also agree with the First District in Cashatt and our sister states that there is no legitimate interstate commerce interest in communicating with Florida minors for the purpose of luring them into sexual activity. Further, the statute is narrowed by the "intent to seduce" element and the requirement that the targeted minor reside in Florida. Thus, any burden that the statute might have on interstate commerce is incidental, at best.
Finally, we conclude that the luring statute does not extend to conduct that takes place wholly outside of Florida's borders, as prohibited under the extraterritoriality effect explained in Healy v. Beer Institute. A person who commits a crime partly in one state and partly in another may be tried in either state under the Sixth Amendment of the United States Constitution. See Lane v. State, 388 So.2d 1022, 1028 (Fla.1980). Section 847.0135(5) provides that a person is subject to criminal jurisdiction in Florida pursuant to chapter 910, Florida Statutes, which governs matters of jurisdiction and venue, for engaging in the proscribed conduct either within or outside the state, provided that the targeted recipient is a minor residing in this state or another person that the actor believes to be a minor residing in this state. See also State v. Ruiz, 909 So.2d 986, 987-88 (Fla. 5th DCA 2005) (holding that section 847.0135(5) established subject matter jurisdiction in Florida courts for prosecution of defendant who transmitted pornography via his computer in Virginia to a person that the defendant believed to be a minor in Florida). Florida's criminal jurisdiction statute provides that a person is subject to prosecution in Florida for an offense committed while the person is either within or outside the state provided that the offense is "committed wholly or partly within the state." § 910.005(1)(a), Fla. Stat. (2005) (emphasis added); see also Simmons v. State, 934 So.2d 1100, 1112 (Fla.2006) (affirming principle that Florida has jurisdiction to prosecute for a crime that is committed either wholly or partly within the state). Section 910.005(2) explains that an offense is committed partly within Florida if "either the conduct that is an element of the offense or the result that is an element, occurs within the state." In the case of using a computer to solicit a Florida minor to engage in prohibited sex acts, the element of soliciting must involve a "child residing in this state" or "another person believed by the [out-of-state defendant] to be a child residing in this state" and thus the conduct takes place partly in Florida where the targeted child resides and receives the e-mail. Cf. Black v. State, 819 So.2d 208, 211-12 (Fla. 1st DCA 2002) (holding that conspiracy carried forward by sending faxes into Florida from another jurisdiction is punishable in Florida under Florida law); State v. Meyers, 72 Haw. 591, 825 P.2d *335 1062, 1064-65 (1992) (holding that for purposes of establishing criminal jurisdiction, "a telephone call constitutes conduct in the jurisdiction in which the call is received"). Thus, when the luring statute is considered in conjunction with Florida's criminal jurisdiction statutes, Florida's criminal jurisdiction extends only to conduct which has sufficient connections with the state. No wholly extraterritorial conduct is ever affected.

CONCLUSION
In light of the statutory limitations contained in Florida's Internet regulations and for the reasons explained above, we reject Simmons' constitutional challenges to sections 847.0135 and 847.0138 of the Florida Statutes. Accordingly, we approve the decision reached by the First District below.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, CANTERO, and BELL, JJ., concur.
NOTES
[1] This statute prohibits the use of a computer service to "seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice, a child or another person believed by the person to be a child" to commit illegal acts relating to sexual battery, lewd or lascivious acts, indecent exposure, or child abuse. See § 847.0135(3), Fla. Stat. (2002). Statutes such as this are commonly referred to as "luring" statutes.
[2] This statute prohibits the transmission to a minor of "an image, information, or data that is harmful to minors" by means of an electronic device or equipment. See § 847.0138(2), Fla. Stat. (2002). Statutes such as this are commonly referred to as "transmission" statutes.
[3] Simmons did not raise any double jeopardy or subject matter jurisdiction arguments in his appeal to the First District Court of Appeal. See Simmons, 886 So.2d at 401 n. 1.
[4] In Cashatt, the First District upheld section 847.0135 against constitutional challenges that the statute violates the First Amendment and the Dormant Commerce Clause.
[5] The Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.
[6] Florida's Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property without due process of law." Art. I, § 9, Fla. Const.
[7] We agree with the First District's interpretation of "electronic mail" as including both email and electronic mail sent by instant messaging. See Simmons, 886 So.2d at 404, 404 n. 3.
[8] In Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court established a three-prong obscenity standard:

(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
(Internal quotation marks and citations omitted.) The CDA included only the "patently offensive" prong of the Miller standard.
[9] COPA included a variation of the three-prong Miller standard described supra in note 8. The COPA standard provided that material is harmful to minors that:

(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
47 U.S.C. § 231(e)(6) (2000).
[10] This statute was amended in 2005 to delete the crime of dissemination of material that is harmful to a minor by computer and to create the crime of child solicitation by computer. See N.M. Stat. § 30-37-3.2(A) (Supp.2006).