DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STEVEN LEIF ALEXANDER, JR.,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

Nos. 4D19-529 and 4D19-530

[January 29, 2020]

Consolidated appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cheryl A. Caracuzzo, Judge; L.T. Case No. 502015CF008279AXXXMB.

Leonard S. Feuer of Leonard Feuer, P.A., West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Luke R. Napodano, Assistant Attorney General, West Palm Beach, for appellee.

CONNER, J.

Steven Leif Alexander, Jr., appeals his convictions and sentences after a jury found him guilty of four counts of transmission of material harmful to minors, and the trial court's subsequent revocation of his probation on prior felonies based on the new law violations. Alexander contends the trial court erred in: (1) instructing the jury on one of the elements of transmission of material harmful to minors; (2) revoking his probation because his convictions for the four new law violations were improper; and (3) denying his pretrial motion to dismiss and motion at trial for judgment of acquittal on the basis of entrapment. We affirm the trial court on the jury instruction issue and explain our reasoning. Because we affirm on the jury instruction issue, the issue regarding revocation of probation is moot. We affirm without discussion the trial court's rulings on the entrapment issue.

*Background*

In 2016, Alexander was placed on probation for burglary and grand theft. In 2017, Alexander was charged with six new felonies, resulting in a jury trial on the new charges and a nonjury trial on the violation of probation. The six new felonies consisted of two counts of soliciting a child for unlawful sexual conduct using a computer and four counts of transmission of material harmful to minors by electronic device or equipment.

The new charges resulted from an undercover investigation of Craigslist internet advertisements.[1] A detective responded to an ad placed by Alexander. The ad title stated "Searching for hot married, taken or prego chics – m4w,"[2] and included a nude photo of Alexander from the chest down, showing an erect penis. The detective responded to the ad by email, using an undercover persona named "Tina," clearly stating she was a 14 year old girl. The response generated a series of rapid succession emails leading to Alexander and the detective exchanging cellphone numbers. Thereafter, Alexander and the detective engaged in approximately 400 text messages. Several photographs were attached to various text messages, including four pictures of Alexander's erect penis. The text messages with the four pictures was the basis of the four counts of transmission of material harmful to minors. In the text messages, Alexander sought pictures of Tina, but the request was denied on the pretext of being shy. Within nine messages, Alexander asked Tina if she wanted to "get naked and dirty." When the detective asked what he meant, Alexander explained he wanted to engage in oral sex with her.

The record shows that the detective did not initiate any sexual conversation in the emails or text messages and the text messages Alexander used for the prosecution were situations in which the picture was unsolicited by the detective. There were times when the detective thought that continued contact had come to an end or she actually invited an end to continued contact, and was surprised when Alexander reinitiated the conversation. The reinitiated discussions by Alexander involved him describing the sexual things he wanted to do with Tina.

The exchanges online between Alexander and the detective began with the detective's email response to Alexander's ad on March 21, 2017, and

---

[1] Craigslist is an internet service for posting classified ads, similar to classified ads in newspapers. One component of the service includes "Personal" ads.
[2] According to arguments made to the jury, "prego chicks" refers to pregnant women. Testimony indicated "m4w" means "man for woman."

ended with a text message received by the detective on April 13, 2017, stating, "You're a whore stop talking to my husband bitch." Alexander was subsequently arrested on the new charges on May 23, 2017.

At trial, Alexander admitted that he regularly used Craigslist to seek sexual encounters. He explained that many times people responding to his ad were not really interested in following through with a sexual encounter or were people interested in identity theft or blackmail. He testified that over time he learned that in order to determine if people responding to his ad were seriously interested in a sexual encounter, he needed to request that the person responding send a picture of herself and give him a cellphone number. He further testified that he could tell if a responder was a "catfish" by whether the person would avoid or couldn't answer simple questions or would not send a picture of herself. If he figured out a responder was a "catfish," he frequently would make a game out of the experience. His defense at trial was that he knew from the initial contact with Tina that she was a "catfish."

The jury returned a verdict finding Alexander guilty of all four counts of transmission of material harmful to minors, but could not agree on a verdict as to the two counts of soliciting a child for unlawful sexual conduct using a computer. The trial court granted a mistrial as to those counts, whereupon the State nolle prossed them. The trial court adjudicated Alexander guilty of the four counts of transmission of material harmful to minors, designated him as a sexual offender on all four counts, revoked his probation, and imposed prison sentences for the four new charges and the two felonies for which Alexander was on probation. Alexander gave notice of appeal.

*Appellate Analysis*

Alexander was charged by information with four counts of transmission of material harmful to minors by electronic device or equipment, a violation of section 847.0138(2), Florida Statutes (2017). The statute proscribes:

> (2) Notwithstanding ss. 847.012 and 847.0133, any person who knew or believed that he or she was transmitting an image, information, or data that is harmful to minors, as defined in s. 847.001, to a specific individual known by the defendant to be a minor commits a felony of the third degree
> . . . .

§ 847.0138(2), Fla. Stat. Section 847.001(6), Florida Statutes (2017), defines "harmful to minors" as:

[A]ny reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:

(a) Predominantly appeals to a prurient, shameful, or morbid interest;

(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and

(c) Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

§ 847.001(6), Fla. Stat. (2017).

Using Florida Standard Jury Instruction (Criminal) 11.21, the jury was instructed as follows:

To prove the crime of material harmful to minors by electronic device or equipment, the state must prove the following three elements beyond a reasonable doubt with this photograph:

(1) Steven Alexander knowingly sent an image, information, or data he knew or believed to be harmful to minors;

(2) Steven Alexander sent the image, information, or data to a specific individual who was either actually known to him to be a minor or believed by him to be a minor; and

(3) Steven Alexander sent the image, information, or data via electronic mail.

An image, information, or data that is harmful to a minor means any reproduction, imitation, characterization, description, exhibition, presentation, or representation of whatever kind or form depicting nudity, sexual conduct, or sexual excitement when it:

(a) predominantly appeals to a prurient, shameful, or morbid interest;

4

> (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
>
> (c) taken as a whole is without serious literary, artistic, political, or scientific value for minors.
>
> . . . .
>
> A "prurient interest" in sex is a shameful or morbid interest in sex, nudity, or excretion. Material does not appeal to a prurient interest if the average person today can view the material candidly, openly, and with a normal interest in sex.

Alexander argues that the trial court erred in giving the standard jury instruction for transmission of material harmful to minors, because the instruction does not instruct the jury to consider whether the allegedly obscene material violates a community standard regarding prurient interest. He further argues that the standard jury instruction does not comport with the requirements imposed by the First Amendment regarding alleged obscenity as explained by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973). Specifically, Alexander argues that the standard jury instruction is deficient because the "prurient interest" prong of the definition of "harmful to minors" does not describe or relate itself to any community standard in evaluating whether the material is "prurient."

The State responds that the standard jury instruction is not erroneous because it: (1) is a correct statement of statutory law; and (2) applies the standard set forth by the Supreme Court in *Ginsberg v. New York*, 390 U.S. 629 (1968), which determined the obscenity standard to be used with regards to minors. Additionally, the State argues that even if the *Miller* standard is applied in this case, any error is harmless.

We agree with the State's counter-arguments. However, with regards to the State's first counter-argument, Alexander does not dispute that the standard jury instruction tracks the statutory language, and he does not argue the statute is unconstitutional, facially or as applied. Instead, Alexander focuses his argument on the fact that the statutory offense addresses material and conduct protected under the First Amendment as freedom of speech. Thus, Alexander contends that in order to properly convict for transmission of material harmful to minors by electronic device or equipment, the jury must be instructed in a way that does not violate constitutional protections. Consequently, we proceed to explain our

agreement with the State's arguments regarding *Ginsberg* and harmless error.

Obscenity Standards under *Miller* and *Ginsberg*

In 1957, a majority of the Supreme Court explained in *Roth v. United States*, 354 U.S. 476 (1957), that obscenity is not protected by the First Amendment. *Id.* at 492. A little more than ten years later, the Court specifically addressed a New York obscenity statute which prohibited the sale to minors under 17 years of age of material defined to be obscene as to minors but not adults. *Ginsberg*, 390 U.S. at 631. In *Ginsberg*, a majority of the Court agreed with and quoted the New York Court of Appeals that:

> [T]he concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined. Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults.

*Id.* at 636 (quoting *Bookcase, Inc. v. Broderick*, 218 N.E.2d 668, 671 (N.Y. 1966)). Thus, the majority concluded that it could not "say that the statute invades the area of freedom of expression constitutionally secured to minors." *Id.* at 637. More specifically, the majority wrote:

> We do not regard New York's regulation in defining obscenity on the basis of its appeal to minors under 17 as involving an invasion of such minors' constitutionally protected freedoms. Rather [the statute] simply adjusts the definition of obscenity "to social realities by permitting the appeal of this type of material to be assessed in term of the sexual interests . . ." of such minors. That the State has power to make that adjustment seems clear, for we have recognized that even where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults[.]"

*Id.* at 638 (second alteration in original) (citations omitted). Importantly, a majority of the Court concluded that "[t]o sustain state power to exclude material defined as obscenity by [a statute directed to the protection of minors] requires only that we be able to say that it was not irrational for

the legislature to find that exposure to material condemned by the statute is harmful to minors." *Id.* at 641. Important to our resolution of the instant appeal, the majority in *Ginsberg* determined that New York's statutory definition of "harmful to minors" was a permissible constitutional basis to restrict access of children to sexual material. The New York statute provided:

> "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it:
>
> (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and
>
> (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and
>
> (iii) is utterly without redeeming social importance for minors.

*Id.* at 646.

Having established in *Ginsberg* that the standards for obscenity can be different for minors, as compared to adults, a majority of the Court five years later in *Miller* reevaluated the standards for determining what is obscene with regards to adults. The Court explained the need for reevaluation:

> While *Roth* presumed "obscenity" to be "utterly without redeeming social importance," *Memoirs*[3] required that to prove obscenity it must be affirmatively established that the material is "utterly without redeeming social value." Thus, even as they repeated the words of *Roth*, the *Memoirs* plurality produced a drastically altered test that called on the prosecution to prove a negative, i.e., that the material was "utterly without redeeming social value"—a burden virtually impossible to discharge under our criminal standards of proof.

---

[3] *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413 (1966), which is frequently referred to as "*Memoirs v. Massachusetts.*"

. . . .

> Apart from the initial formulation in the *Roth* case, *no majority of the Court has at any given time been able to agree on a standard to determine what constitutes obscene, pornographic material subject to regulation under the States' police power.*

*Miller*, 413 U.S. at 21-22 (emphasis added).  After observing that "State statutes designed to regulate obscene materials must be carefully limited," the majority went on to hold that for adults as possessors or recipients of sexual material,

> [t]he basic guidelines for the trier of fact must be: (a) whether "the average person, *applying contemporary community standards*" would find that the work, taken as a whole, appeals to the prurient interest[]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.  We do not adopt as a constituional [sic] standard the "utterly without redeeming social value" test of *Memoirs v. Massachusetts*, 383 U.S., at 419, 86 S.Ct., at 977; that concept has never commanded the adherence of more than three Justices at one time.[]  If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellante [sic] courts to conduct an independent review of constitutional claims when necessary.

*Id.* at 24-25 (emphasis added).

Two years after *Miller*, a majority of the Court again affirmed that "[i]t is well settled that a State or municipality can adopt more stringent controls on communicative [sexual] materials available to youths than on those available to adults".  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975) (citing to *Ginsberg*).  Important to our analysis, the Court wrote in footnote that "[w]e have not had occasion to decide what effect *Miller* will have on the *Ginsberg* formulation."  *Id.* at 213 n.10.

We deem it important to note that on the subject of standards for judging obscenity, or the areas of sexual material that can be

constitutionally restricted by government, the Supreme Court has many plurality decisions and few majority decisions. Focusing on the majority opinions issued in *Roth*, *Ginsberg*, *Miller*, and *Erznoznik*, we glean the following clear legal principles:

(a) Obscenity is not protected by the First Amendment.

(b) Standards for restricting access to sexual materials or conduct by governments can be constitutionally permissible for minors, even though the same standards would not be permissible for adults.

(c) Governments can restrict the access of minors to sexual materials and conduct if it is harmful to minors.

(d) The statutory definition of "harmful to minors" reviewed in *Ginsberg* was deemed to not violate the First Amendment.

Applying the above clear legal principles, we conclude that the standard jury instruction used in this case is an accurate statement of Florida law, including the definition of "harmful to minors," which has been determined by the Supreme Court to properly allow the state to restrict the access to minors of certain sexual material and conduct. We reject Alexander's argument that *Miller* changed the status of constitutional law regarding minors as stated in *Ginsberg*. More specifically, we hold that until a majority of the United States Supreme Court or the Florida Supreme Court holds otherwise, the jury does not need to be specifically instructed that it is to use a community standard, statewide or countywide in determining if material or conduct is prurient.

In addition to our reliance on the majority opinions in *Roth*, *Ginsberg*, *Miller*, and *Erznoznik*, we find additional support for our holding from our reading of the Florida Supreme Court's opinion in *Simmons v. State*, 944 So. 2d 317 (Fla. 2006), as well as a provision of the standard jury instruction not discussed by either side in the briefs.

In *Simmons*, our supreme court approved the decision of the First District declaring section 847.0138 to be a valid statute after it was attacked by Simmons as being facially unconstitutional. *Id.* at 321. The facially unconstitutional claim was grounded on arguments that the statute violates the First and Fourteenth Amendments because it is overly broad in its proscription. *Id.* at 322. Although the court did not address any issue concerning jury instructions, in upholding the constitutionality of the statute, the court wrote:

9

> The term "harmful to minors" is defined in section 847.001(6), Florida Statutes (2002), and incorporates the constitutional standard for obscenity established by the United States Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as modified for juveniles in *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

*Id.* at 325. Thus, it seems clear that our supreme court agrees that the *Miller* standard for obscenity applicable to adults is modified by the *Ginsberg* standard applicable to minors.

We also deem it significant that the standard jury instruction for section 847.0138 instructs the jury that:

> A "prurient interest" in sex is a shameful or morbid interest in sex, nudity, or excretion. Material does not appeal to a prurient interest *if the average person today can view the material candidly, openly, and with a normal interest in sex.*

Fla. Std. Jury Instr. (Crim.) 11.21 (emphasis added). If it is the case that *Miller* imposes a requirement that the prurient interest prong for defining obscenity be determined by using a community standard, in our view the definition of "prurient interest" in the standard jury instruction meets that requirement.

For the reasons discussed above, we hold that the trial judge did not err in using standard jury instruction 11.21.

Harmless Error Analysis

The State argues that even if the standard jury instruction was deficient, any error is harmless because no jury would find that the four pictures used by the prosecution did not predominantly appeal to a prurient, shameful, or morbid interest. We agree with the State's argument.

In *Pope v. Illinois*, 481 U.S. 497 (1987), the Supreme Court addressed whether a national or local community standard applied to the literary, artistic, political, or scientific value prong for assessing whether material is obscene for adults. *Id.* at 498-99. In that case, the trial court instructed the jury to apply a community standard from a local viewpoint. The Supreme Court clarified in *Pope* that a local viewpoint standard is to be applied for the prurient interest and patent offensiveness prongs of *Miller's*

10

three-part assessment, but a national viewpoint standard is to be applied to the value prong. *Id.* at 500-01. Because the trial court used the wrong standard, the Court went on to determine whether the error was harmless. *Id.* at 501. The Court noted that "[a]lthough we plainly have the authority to decide whether, on the facts of a given case, a constitutional error was harmless under the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we do so sparingly." *Id.* at 504. The Court also determined in *Pope* that the instruction using the wrong community standard was harmless, reasoning that:

> [I]n the present cases the jurors were not precluded from considering the question of value: they were informed that to convict they must find, among other things, that the magazines petitioners sold were utterly without redeeming social value. While it was error to instruct the juries to use a state community standard in considering the value question, if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand.

*Id.* at 503.

Similarly, if we were to agree with Alexander that the jury was improperly instructed on the correct standard to be used in evaluating whether the pictures used by the prosecution met the prurient interest prong of *Miller*, we are satisfied that the record clearly establishes that no rational juror would find the standard was not met, if properly instructed.

*Conclusion*

Having determined that the trial court did not err in instructing the jury, denying the pretrial motion to dismiss and motion for judgment of acquittal based on entrapment, and revoking probation, we affirm Alexander's convictions, revocation of probation, and sentences.

*Affirmed.*

LEVINE, C.J., and KUNTZ, J., concur.

\*      \*      \*

**Not final until disposition of timely filed motion for rehearing.**

11