Filed 6/22/26  P. v. Washington CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087614 |
| Plaintiff and Respondent, | (Super. Ct. No. SWF2100477) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| BRASHAWN REYNARD WASHINGTON, | CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed June 2, 2026, be modified to delete the text of Discussion section III on pages 17–18 in its entirety and replace it with the following:

> After we filed our initial opinion, Washington filed a "Request for Correction" asking that the opinion be modified to state that the out-on-bail enhancement imposed under section 12022.1 cannot be reimposed on remand due to our reversal of count one for insufficient evidence.  We construed the request as a petition for rehearing and invited the People to file an answer.  In their answer, the

People concede that the out-on-bail enhancement may not be reimposed on remand as a result of our reversal of count one, which was the only "primary" offense used to impose the enhancement.  (See § 12022.1, subd. (a)(1) [defining the " 'Primary offense' " to mean a felony for which the person was released on bail]; *id*. at subd. (a)(2) [defining the " 'Secondary offense' " as the felony committed while the person was released from custody for the primary offense]; *id*. at subd. (g) [stating that if the primary offense is reversed on appeal, the out-on-bail enhancement must be "suspended pending retrial" and reimposed only upon retrial and reconviction].)  We accept the People's concession and agree that the out-on-bail enhancement may not be reimposed on remand.

This modification order changes the appellate judgment.  (Cal. Rules of Court, rule 8.264(c)(2).)

The petition for rehearing is denied as moot as a result of this modification.

BUCHANAN, Acting P. J.

Copies to:  All parties

Filed 6/2/26  P. v. Washington CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087614 |
| Plaintiff and Respondent, | (Super. Ct. No. SWF2100477) |
| v. | |
| BRASHAWN REYNARD WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed in part, reversed in part, remanded for resentencing.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Andrew S. Mestman and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Brashawn Reynard Washington appeals from a judgment imposed after a jury convicted him of five offenses involving three minor victims and the court sentenced him to 11 years four months in prison. He challenges the sufficiency of evidence of the intent element of count one for distributing or sending harmful material to minor victim J.Z. (Pen. Code,[1] § 288.2, subd. (a)(2).) On this count, we conclude there is insufficient evidence Washington sent harmful material to J.Z. with the required intent to engage in sexual conduct or intimate touching with him. We therefore reverse the conviction and eight-month consecutive sentence for count one, remand for full resentencing, and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Convictions and Sentence*

A jury convicted Washington of two counts involving minor victim J.Z., two counts involving minor victim A.B., and one count involving minor victim A.T. The conviction in count one was for distributing, sending, or exhibiting harmful material to J.Z. (§ 288.2, subd. (a)(2).) Count two was for annoying or molesting J.Z. (§ 647.6, subd. (a)(1).) Count three was for possession of child sexual abuse materials depicting A.B. (§ 311.11, subd. (a).) Count four was for production of child sexual abuse materials depicting A.B. (§ 311.4, subd. (b).) Count five was for annoying or molesting A.T. (§ 647.6, subd. (a).)

The court sentenced Washington to a total prison term of 11 years and four months. The sentence was calculated as follows: the upper term of eight years for count four; a consecutive one-third middle term of eight months for counts one and three; concurrent terms of eight months on misdemeanor

---

[1]    Hereafter, all undesignated statutory references are to the Penal Code.

2

counts two and five; and a two-year consecutive term for the out-on-bail enhancement.

As relevant to this appeal, count one required that Washington must have shared harmful material with J.Z. "with the intent or for the purposes of engaging in sexual intercourse, sodomy, or oral copulation with the other person, or with the intent that either person touch an intimate body part of the other." (§ 288.2, subd. (a)(1).)

We next summarize the trial evidence.

B. *Victim J.Z. – Counts 1 and 2*

Washington was a teacher at a middle school in Riverside County for the 2019–2020 school year. He taught an "exploratory" sixth grade class. Washington had just received his preliminary teaching credential and was a brand-new teacher. He was 25 years old at the beginning of the school year.

J.Z. was 11 years old when he started sixth grade in August 2019. He was in Washington's exploratory class. J.Z. described it as "like a free period so you can do work on … other classes" with a teacher present to provide assistance. J.Z. saw Washington every day in class. Washington talked to J.Z. and other students in class about playing video games.

In March 2020, the school shifted to remote learning due to the COVID pandemic. During this period, J.Z. began to have contact with Washington outside of school hours. Washington used a messaging platform to contact J.Z. The two played Fortnite and other video games together online, sometimes late into the evening. At Washington's suggestion, J.Z. downloaded an app on his phone so they could talk while playing video games together.

Between April and May 2020, Washington sent multiple electronic messages to J.Z. One of his messages had a heart emoji and another a

kissing emoji.  Washington also asked J.Z. why he had not applied to be his teaching assistant for the next year and said J.Z. was his favorite student in the class.  Soon after, Washington asked J.Z. if he posted videos of himself on TikTok and told him, "You'd be great."  Later, Washington inquired if J.Z. had been working out and said he worked out every day "trying to get buff."  In another message, Washington referred to J.Z. as "guapo" or "good looking."  During one exchange, when J.Z. told Washington that he "just got out of the pool," Washington responded that he was "jealous AF" (as fuck) and that he also wanted to "get in the pool."

Washington also sent J.Z. videos on TikTok.  One video depicted a woman opening a plastic water bottle through her pants to make it look as if she was opening it with her vagina.  In another, the camera panned a messy bedroom and showed a brief glimpse of a boy's penis.  The latter video embarrassed and bothered J.Z.

During this time period, J.Z.'s mother noticed he was acting quiet and "weird" and decided to search his phone.  She discovered the messages and videos and reported them to the school in May 2020.  School officials referred the matter to law enforcement and allowed Washington to resign instead of being terminated.  Law enforcement interviewed Washington about J.Z. on August 17, 2020.

C. *Victim E.P. – Uncharged Conduct*[2]

In August 2020, Washington began a new job as a math teacher at a Pasadena high school.  At the beginning of the year, the school was doing

---

[2]    The court admitted evidence of uncharged criminal conduct against E.P. under Evidence Code sections 1101, subdivision (b) and 1108.  The court instructed the jury with CALCRIM No. 375 on evidence of uncharged criminal conduct to prove identity, intent, and knowledge for the charged

remote instruction because of the COVID pandemic. Washington was still living in Riverside County.

Washington taught an honors math class. In October 2020, E.P. transferred into his class as a 14-year-old freshman. E.P. was the only freshman in the class. E.P. discussed his age with Washington and Washington knew he was 14. Washington told E.P. he was impressed E.P. was in the class as a freshman.

During the school year, E.P. and Washington began playing Fortnite together online. They had casual conversations with each other using a voice chat feature while playing Fortnite. E.P. also communicated with Washington through Snapchat, Instagram, and TikTok.

E.P. turned 15 in March 2021. In April 2021, the school opened again for optional in-person instruction. E.P. chose to attend in person, but most other students stayed online. E.P. met Washington for the first time in person and attended Washington's class in person until the school year ended.

E.P. continued communicating with Washington over the summer of 2021. They played Fortnite together late at night, had private conversations, and had a SnapChat streak of 400 consecutive days. Washington sent photos of himself smoking marijuana and dancing. E.P. came to consider Washington a friend.

---

offenses. The court also gave CALCRIM No. 1191A on use of evidence of uncharged crimes to prove disposition to commit sexual offenses and CALCRIM No. 1191B on use of evidence of charged offenses to prove disposition to commit the other charged sexual offenses. Washington does not challenge any of the court's evidentiary rulings or jury instructions on appeal.

5

When school resumed in the fall of 2021, Washington was no longer E.P.'s teacher but they continued to play Fortnite and message each other on SnapChat. In late 2021, Washington began discussing his sex life with E.P. He talked to E.P. about oral sex and said he performed oral sex on his roommate often.

In 2022, Washington sent E.P. photos via SnapChat depicting his own genitals and himself performing oral sex on another man. E.P. began to document the messages he was receiving from Washington by taking photos of them on his cell phone. These included a photo of Washington wearing red underwear with an erect penis, a photo of a fully naked male body, videos and photos of naked penises, and a photo of Washington wearing a thong.

In August 2022, after E.P. posted a photo of himself shirtless on SnapChat, Washington told him on a Fortnite call that he "looked attractive but a little anorexic." Washington began asking E.P. to send naked photos of himself. This made E.P. feel a "new level" of uncomfortable. In October 2022, E.P. disclosed the inappropriate communications to his father, who contacted the school principal. The principal referred the matter to the police. E.P. and his father gave the police access to E.P.'s phone and laptop.

D. *Victim A.B. – Counts 3 and 4*

In November 2021, while he was still teaching at the Pasadena school, Washington began communicating with 12-year-old Florida resident A.B. on a website that allowed strangers to meet online. They talked face-to-face on camera. They "interviewed" each other and discussed video games, their ages, and where they lived.

Washington brought up ways for A.B. to make money and offered to post pictures of him. Washington claimed he earned $10,000 each month from his own account on OnlyFans, a website for posting sexually explicit

6

content.  A.B. said he wanted to buy a new gaming station, so Washington offered to "light up [A.B.'s] Cash App."  Cash App is a way to send and receive money.  When A.B. asked how to get an OnlyFans account, Washington answered he would need "to be 18 for starters."

A.B. began sending nude and sexually explicit photos and videos of himself to Washington.  Washington took over A.B.'s Twitter account for him, posted the nude photos of A.B., charged people to join A.B.'s "Twitter circle," and paid A.B. via Cash App.  Washington instructed A.B. on the content of the photos, including telling him how to hold his penis so it appeared bigger and longer.  Washington also sold a video of A.B. to a third party on A.B.'s behalf.  The relationship between Washington and A.B. continued through the fall of 2022.

In a subsequent search of Washington's SnapChat account, police found multiple photographs and videos of A.B.  These included photographs of A.B.'s face, body, and penis, as well as images of him masturbating and ejaculating.

E.  *Victim A.T. – Count 5*

In the fall of 2022, A.T. was 14 years old and a freshman in high school in Riverside County.  Washington was a longtime family friend who played video games with A.T.  A.T. spent time alone with Washington at his house playing video games together and sometimes smoking marijuana.  At times, Washington's mother or his housemates were present.

On occasion, Washington came to A.T.'s house in Temecula to pick A.T. up and bring him back to Washington's house in Hemet.  A.T. sometimes spent the weekend at Washington's house.  They also went to the gym or ran errands together.  According to A.T., they had no sexual contact of any kind.  Washington never talked to him about having sex or wanting to have sex and

7

never showed him pornographic images.  They exchanged messages and photos on Instagram about getting high.  They also sent each other "selfie[s]" to show progress of their gym workouts.

In the search of Washington's SnapChat account, law enforcement discovered a video Washington had sent to A.T.  The video showed Washington completely naked with his hand on his own penis.

F. *Grooming Evidence*

At trial, the People elicited expert testimony on grooming of child victims from DA Investigator Bertram Blinn, who specializes in internet crimes against children.  Investigator Blinn described online grooming as an escalating pattern of desensitizing behavior from a trusted adult, including communicating across multiple platforms, sending explicit images, and requesting explicit images.  In his opinion, Washington's communications with J.Z. were consistent with this type of grooming behavior.

Based on his training and experience, Investigator Blinn testified that about 75 percent of the time when an adult sends explicit images to a law enforcement officer posing as a child online, the person will then arrange a meeting and show up with the intent to have a sexual relationship.  However, not all adults who engage in this type of grooming behavior "share the same end goal."  Some "live in fantasy" and just want to receive child pornography; some "want to build their child porn collection"; and some "get off" on having the children touch themselves sexually.

G. *Washington's Testimony*

Washington testified in his own defense.  He denied sending J.Z. the videos of a woman pretending to open a water bottle with her vagina and a boy's penis.  Washington initially testified these could have been random

videos he shared to all his followers, but later claimed that A.T. had told him he was the one who sent the videos to J.Z.

As to E.P., Washington testified he did not know that E.P. was only a freshman in his honor's math class and did not have any conversation with E.P. about his age. Washington continued his relationship with E.P. for over a year even after he stopped teaching in Pasadena in May 2021. Washington was no longer teaching there when he first discussed sex with E.P. in October 2022. According to Washington, he thought E.P. was 19 years old by then. Washington claimed that when the police informed him of E.P.'s true age, "I was flabbergasted because I don't have any interest in children . . . ."

With respect to one of the videos E.P. testified he received from Washington, Washington acknowledged that the video showed "[s]omeone playing with their penis" but could not recall whether he sent it to E.P. He denied asking E.P. to send him naked photos of himself. He denied talking to E.P. about giving oral sex to his roommate.

Washington admitted assisting A.B. with his Twitter account and posting naked photos for him for money. However, he believed A.B. was at least 18 years old because they met on a website for adults and A.B.'s profile had a "no one under 18" symbol. Washington did not learn A.B.'s true age until he was contacted by the police.

As to A.T., Washington admitted using marijuana with him. Washington denied sending the video of himself naked directly to A.T. Instead, he sent the video to a group chat that included A.T. The purpose of the video was to show Washington's "gym gains." Washington explained that his hand was on his penis to make sure it was covered.

9

I

As noted, the jury convicted Washington in count one of distributing, sending, or exhibiting harmful material to J.Z. in violation of section 288.2, subdivision (a)(2).  On appeal, he challenges the sufficiency of the evidence to support the intent element of this offense, which required that he must have shared the material with J.Z. "with the intent or for the purposes of engaging in sexual intercourse, sodomy, or oral copulation with the other person, or with the intent that either person touch an intimate body part of the other." (§ 288.2, subd. (a)(1).)  Washington argues that: (1) Investigator Blinn's grooming testimony is not proof beyond a reasonable doubt of the required intent; (2) there is no evidence Washington asked J.Z. or any of the other victims to meet with him or inquired where they lived or fantasized about being together; and (3) there is no evidence he engaged or attempted to engage in any sex acts with a minor.  The People respond that the totality of Washington's conduct with J.Z. and the other minor victims, coupled with Investigator Blinn's testimony, was sufficient circumstantial evidence for the jury to infer he had the necessary intent to engage in sexual conduct or intimate touching with J.Z.

We apply the substantial evidence standard in reviewing a claim of insufficient evidence.  We must examine the record "in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)  In doing so, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*Ibid.*)  The relevant question for purposes of substantial evidence

10

review "is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*Ibid.*) Reversal based on insufficient evidence is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Substantial evidence includes circumstantial evidence and any reasonable inferences that can be drawn from the evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 943.) We presume every reasonable inference from the evidence to support the judgment. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"While 'it is the jury, not the appellate court which must be convinced of the defendant's guilt' [citation], in order to affirm, we must be able to conclude the evidence is sufficient to have convinced that jury of the defendant's guilt beyond a reasonable doubt." (*People v. Lara* (2017) 9 Cal.App.5th 296, 320 (*Lara*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [conviction based on insufficient evidence violates due process clause of Fourteenth Amendment].) In making this determination, we must " 'necessarily take [into] account' " the prosecution's burden of proof beyond a reasonable doubt at trial. (*People v. Ware* (2022) 14 Cal.5th 151, 167.) The question "is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1009.)

We begin with Investigator Blinn's testimony that 75 percent of adults who send explicit images to undercover law enforcement agents posing as children online will arrange a meeting and show up with the intent to have a sexual relationship. Although this testimony was admitted without objection, we caution that California courts have excluded other similar forms of

11

probability evidence. (See, e.g., *People v. Collins* (1968) 68 Cal.2d 319, 327–332; *People v. Julian* (2019) 34 Cal.App.5th 878, 880, 885–889; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568–572 (*Wilson*).) "Statistical odds . . . are not a substitute for admissible evidence to decide the guilt or innocence of the defendant." (*Julian*, at p. 880.) We will not decide the admissibility of this probability evidence, however, because we must consider all admitted evidence in our sufficiency of evidence review. (See *People v. Panah* (2005) 35 Cal.4th 395, 476 [incompetent testimony received without objection takes on the attributes of competent proof when considered on the sufficiency of evidence to support a finding].)

Washington contends that Investigator Blinn's 75 percent figure is not proof beyond a reasonable doubt of his intent to engage in sexual conduct or intimate touching with J.Z. Even assuming the accuracy of this estimate, we agree it does not constitute proof beyond a reasonable doubt. Taken at face value, this figure necessarily means that one in four adults who engage in this type of grooming conduct do *not* attempt to meet with the minor in person. According to Investigator Blinn, the "end goal" is not the same for everyone who engages in such conduct: some "live in fantasy" and just want to receive child pornography; some "want to build their child porn collection"; and some just "get off" on having the children touch themselves sexually.

Investigator Blinn's testimony did nothing to assist the jury in determining whether Washington fell into the 75 percent group or the 25 percent group. As the *Wilson* court noted in discussing similar statistical evidence that only 1 to 6 percent of sexual abuse allegations are false, "that fact would not be helpful to the jury because it tells the jury nothing about whether *this particular allegation* is false." (*Wilson, supra*, 33 Cal.App.5th at p. 571.) Investigator Blinn's probability testimony was therefore insufficient

to prove beyond a reasonable doubt that Washington acted with the intent to commit sexual conduct or intimate touching with J.Z.

We must therefore consider whether the other evidence was sufficient to prove such an intent when considered in combination with Investigator Blinn's testimony. We conclude it was not. Although there was ample evidence of Washington's sexual attraction to children and child pornography, there was no evidence that he had ever engaged or attempted to engage in any sexual conduct or intimate touching with a minor, or that he had expressed an intent to do so, or that he had made any arrangements to meet a minor in person for such a purpose. The record is devoid of evidence of the type offered to prove intent in other cases of this nature. (See, e.g., *People v. Nakai* (2010) 183 Cal.App.4th 499, 509–510 [defendant sent images of his own erect penis along with messages such as " 'Will you suck my dick?' " and " 'We can just lick each other, oral' "]; *People v. Hsu* (2000) 82 Cal.App.4th 976, 981 [defendant sent boy explicit images of himself and "offered to engage in specific sexual acts, and invited the boy to meet him at his house"].)

In his communications with J.Z., Washington never made any suggestion that they meet in private or engage in any sexual conduct or touching. In two years of constant interactions with E.P. and one year of interactions with A.P., Washington also never attempted to meet with either of them privately or proposed engaging in any type of sexual conduct together. When E.P. returned to Washington's class in person at the end of the 2020–2021 school year, Washington made no sexual overture or attempt to be alone with E.P. Moreover, Washington had regular contact with A.T. in person, including picking A.T. up at his home in Temecula, driving him to and from Washington's home in Hemet, using marijuana with A.T. at Washington's home, having A.T. spend the weekend at his home, and going to

the gym and running errands together.  Yet there is no evidence Washington ever committed or attempted to commit any sexual act or intimate touching with A.T. or expressed any intent to do so.

The People recite the overall evidence of Washington's disturbing conduct with all four minor victims, but they do not connect the dots to explain how any of this evidence supports an inference that Washington intended to commit a sexual act or intimate touching with J.Z.  Although the evidence is overwhelming that Washington committed criminal conduct by soliciting and exchanging sexually explicit photos, videos, and messages with the minor victims, and possessing and producing child pornography, the charge in count one required evidence of an intent to commit an entirely different criminal act involving actual sexual contact or intimate touching with a minor.  Other than Investigator Blinn's 75 percent probability figure, the People cite no evidence to support a finding beyond a reasonable doubt that Washington intended to make the leap from exchanging sexually explicit material online to in-person child molestation.

In these circumstances, even when viewed in the light most favorable to the prosecution, the totality of the evidence does not establish beyond a reasonable doubt that Washington sent harmful material to J.Z. with an intent to have sexual or intimate contact with him.  " 'Although we must draw all reasonable inferences in favor of the prosecution, a "reasonable" inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence.' " (*Lara, supra,* 9 Cal.App.5th at p. 324.)  "A jury must avoid unreasonable inferences and not resort to imagination or suspicion.  Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof." (*People v. Collins* (2025) 17 Cal.5th 293, 307–308 [cleaned up].)  Washington's

14

conduct with the victims was unquestionably harmful, but on this record, the evidence of his specific intent to commit a sexual or intimate act with J.Z. does not rise to a level beyond bare suspicion or conjecture.

We therefore reverse Washington's conviction on count one and the eight-month consecutive sentence imposed for that count. This also requires us to remand the matter for full resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 [remand for full resentencing required where part of sentence is stricken on review].)

## II

Washington next raises two sentencing issues under section 654. First, he argues that section 654 precluded dual punishment for both counts one and two involving victim J.Z. Second, he makes the same argument for counts three and four involving victim A.B. The first of these issues is moot and cannot arise again on remand because we are reversing the conviction in count one. The second is also technically moot because we are remanding for full resentencing, but we will nevertheless decide the issue for the trial court's guidance on remand.

The jury convicted Washington of two crimes involving victim A.B. In count three, the jury found Washington guilty of possession of child sexual abuse materials depicting A.B. (§ 311.11, subd. (a)). In count four, the jury found Washington guilty of production of child sexual abuse materials depicting A.B. (§ 311.4, subd. (b)). At sentencing, the court imposed an upper term sentence of eight years for count four and a consecutive eight-month sentence for count three. Washington argues the court violated section 654 by imposing dual punishment for these two crimes. We disagree.

Section 654 prohibits multiple punishment for an "act or omission" that is punishable in different ways by different provisions of law. This restriction

15

applies not only to a single act or omission, but also an indivisible "course of conduct" violating multiple provisions. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207–1209, internal quotation marks omitted.) Whether a course of conduct is divisible for purposes of section 654 depends on the intent and objective of the defendant. (*People v. Fuentes* (2022) 78 Cal.App.5th 670, 680.) If multiple offenses were incident to a single objective, the defendant may be punished for no more than one. (*Ibid.*) However, a course of conduct divisible in time, though directed to only one objective, may give rise to multiple violations and punishment, particularly when the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. (*People v. Andra* (2007) 156 Cal.App.4th 638, 640 (*Andra*).)

When section 654 applies, it "does not allow any multiple punishment, including either concurrent or consecutive sentences." (*People v. Deloza* (1998) 18 Cal.4th 585, 592.) If punishment for multiple offenses is prohibited by section 654, the court must impose sentence for one of the offenses and stay sentence on the others. (*Deloza*, at pp. 591–592.) We review any express or implied factual findings underlying the trial court's ruling for substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) We must review the record in a light most favorable to the trial court's decision and assume any facts the trial court could have reasonably deduced from the evidence presented at trial. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

We conclude substantial evidence supports the trial court's implied finding that counts three and four were divisible and therefore separately punishable. Over the period of approximately one year before his arrest, Washington received multiple explicit images from A.B. He assisted A.B. in

16

producing some of those images—coaching him on how to pose and what to photograph—and in selling them or posting them for money. He also maintained the pornographic images and videos A.B. sent him, which he still had in his possession at the time of arrest. The trial court could reasonably have concluded that Washington's one-year course of conduct with A.B. gave him ample opportunity to reflect and renew his intent, making multiple punishments permissible even if the objective was the same. (*Andra*, *supra*, 156 Cal.App.4th at p. 640.)

The record also supports a finding that Washington had two separate objectives for the offenses. The trial court could reasonably have found that his continued possession of the images and videos of A.B. underlying count three (§ 311.11, subd. (a)) was for his own sexual gratification, whereas his motive for assisting A.B. in the production of child pornography for count four was financial (§ 311.4, subd. (b) [requiring that the production of child sexual abuse materials be "for commercial purposes"]). If "the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267–268.) We therefore find no section 654 violation as to counts three and four.

### III

Finally, Washington argues that the court improperly imposed an out-on-bail enhancement (§ 12022.1) for his conviction on count five because it was for a misdemeanor. He contends that section 12022.1 may not be applied to a misdemeanor conviction. In response, the People assert that the section 12022.1 enhancement was actually imposed for the felony counts charged in

17

counts three and four as to victim A.B., rather than the misdemeanor charged in count five as to victim A.T. The People acknowledge that the court minutes and abstract of judgment indicate it was imposed for count five, but assert this was a clerical error that should be corrected. Although we are remanding for resentencing, we elect to decide this question for the trial court's guidance on remand.

We agree with the People. The operative information set forth the five charged counts, then separately alleged the out-on-bail enhancement as to "the above listed *felony offense(s) . . . .*" (Italics added.) Thus, the enhancement was not alleged for the misdemeanor charged in count five as to victim A.T. Moreover, when the trial court found the out-on-bail enhancement allegation true and then imposed sentence on it, the court never suggested it was doing so as to count five. On the contrary, the evidence and arguments presented at the court trial on the enhancement make clear it was alleged and found true because Washington was out on bail for the charged crimes against J.Z. (originally charged in case number SWF2100477) when he committed the offenses against A.B. (originally charged in case number SWF2300823). The crimes originally charged in SWF2300823 were all felonies.

We therefore agree with the People that the court found true the out-on-bail allegation for the felonies involving victim A.B. and intended to impose this enhancement for one of those felonies. If the court imposes the out-on-bail enhancement again on remand, it should specify whether it is imposing the enhancement for count three or count four. (See *People v. Augborne* (2002) 104 Cal.App.4th 362, 375–377 [§ 12022.1 out-on-bail enhancements go to nature of offender and may be imposed only once in a particular case].)

18

DISPOSITION

The conviction for count one is reversed and the matter is remanded to the trial court for full resentencing consistent with this opinion.  The judgment is otherwise affirmed.

BUCHANAN, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.

19